Patrick R. Leverty, Esq., NV Bar No. 8840
William R. Ginn, Esq., NV Bar No. 6989
LEVERTY & ASSOCIATES LAW, CHTD.
832 Willow Street
Reno, NV 89502
Phone (775)322-6636
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JIAHAN YU, derivatively on behalf of DRAFTKINGS INC., <br><br> Plaintiff <br> v. <br><br> JASON D. ROBINS, JASON K. PARK, JEFFREY SAGANSKY, ELI BAKER, SCOTT M. DELMAN, JOSHUA KAZAM, FREDRIC ROSEN, SCOTT I. ROSS, M. GAVIN ISAACS, MATTHEW KALISH, WOODROW H. LEVIN, PAUL LIBERMAN, SHALOM MECKENZIE, JOCELYN MOORE, RYAN R. MOORE, VALERIE MOSLEY, STEVEN J. MURRAY, HANY M. NADA, RICHARD ROSENBLATT, JOHN S. SALTER, HARRY EVANS SLOAN, and MARNI WALDEN <br><br> Defendants, <br><br> and <br><br> DRAFTKINGS INC. f/k/a DIAMOND EAGLE ACQUISITION CORP., <br><br> Nominal Defendant. | Case No.: 3:22-cv-0005 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jiahan Yu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant DraftKings Inc. f/k/a Diamond Eagle Acquisition Corp. ("DraftKings" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Jason D. Robins ("Robins"), Jason K. Park ("Park"), Jeffrey Sagansky ("Sagansky"), Eli Baker ("Baker"), Scott M. Delman ("Delman"), Joshua Kazam ("Kazam"), Fredric Rosen

("Rosen"), Scott I. Ross ("Ross"), M. Gavin Isaacs ("Isaacs"), Matthew Kalish ("Kalish"), Woodrow H. Levin ("Levin"), Paul Liberman ("Liberman"), Shalom Meckenzie ("Meckenzie"), Jocelyn Moore ("J. Moore"), Ryan R. Moore ("R. Moore"), Valerie Mosley ("Mosley"), Steven J. Murray ("Murray"), Hany M. Nada ("Nada"), Richard Rosenblatt ("Rosenblatt"), John S. Salter ("Salter"), Harry Evans Sloan ("Sloan"), and Marni Walden ("Walden") (collectively, the "Individual Defendants" and with DraftKings, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of DraftKings, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DraftKings, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed from December 23, 2019, through June 15, 2021, both dates inclusive (the "Relevant Period"), by the controlling shareholders, directors, and officers of a special purpose acquisition company ("SPAC") called Diamond Eagle Acquisition Corp. ("DEAC") as well as the controlling shareholders, directors, and officers of DEAC's successor entity, DraftKings following its emergence as a result of the consummation of a business combination agreement in April 2020 (the "Merger") between DEAC, a separate entity also called DraftKings Inc. ("Old DK,"), and SBTech (Global) Limited ("SBTech"), now a wholly owned subsidiary of the Company.

2.      Specifically, Defendants Robins, Baker, Delman, Kalish, Kazam, Liberman, Meckenzie, Park, Rosen, Ross, Sagansky, Salter, and Sloan, caused DraftKings' predecessor, Old DK, and DEAC to merge with SBTech, despite SBTech's long and ongoing record of operating unlawfully in markets where online gambling is restricted (the "Illicit Operations"), and Defendants Robins, Isaacs, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Park, Rosenblatt, Salter, Sloan, and Walden failed to ensure the cessation or disclosure of the Illicit Operations following the Merger. In addition to engaging in or causing the Company to engage in the Illicit Operations, the Individual Defendants made or caused the Company to make materially false and/or misleading statements that failed to disclose the Illicit Operations and the heightened risks the Company faced as a result of SBTech's engaging in the Illicit Operations.

3.      Prior to the Merger, DEAC was a SPAC, also known as a "blank check company," created for the purpose of acquiring a private company and taking it public through a merger. DEAC consummated an initial public offering on May 14, 2019 (the "IPO"). Old DK was a digital sports entertainment and gaming company known for its daily fantasy sports and mobile sports betting platforms. SBTech, a company limited by shares, incorporated in Gibraltar and continued as a company under the Isle of Man Companies Act 2006 and based in Bulgaria, was a global provider of business-to-business technology for sports betting, trading services, and marketing and bonus tools for sports betting and online gaming brands.

4.      On December 23, 2019, DEAC, Old DK, and SBTech announced that they had entered into a business combination agreement on December 22, 2019.[1] Pursuant to the business combination agreement: (1) DEAC, a Delaware corporation, agreed to change its jurisdiction of incorporation to Nevada by merging with and into DEAC NV Merger Corp., its wholly-owned subsidiary, with DEAC NV Merger Corp. surviving the merger and being renamed "DraftKings Inc.," nominal defendant herein, (2) DEAC Merger Sub Inc., a Delaware corporation and wholly-

---

[1] The business combination agreement was later amended on April 7, 2020, prior to the consummation of the agreement on April 23, 2020.

owned subsidiary of DEAC, merged with and into Old DK with Old DK surviving the merger (the "Old DK Merger"), and (3) immediately following the Old DK Merger, DraftKings acquired all of the issued and outstanding share capital of SBTech. Following the Merger, Old DK and SBTech became wholly owned subsidiaries of DraftKings, a Nevada corporation based in Boston, Massachusetts.

5.    In statements issued after the Merger, DraftKings has described itself as providing users with daily fantasy sports, sports betting and online casino opportunities, and being involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sports betting and casino gaming products.

6.    The online gambling industry poses significant compliance challenges for companies, as various jurisdictions around the world, especially those in Asia, prohibit some or all forms of online gambling. Yet, although countries such as Vietnam, Indonesia, and China restrict online gambling, from at least 2014 until 2017, SBTech was advertising that it accepted currencies in certain of those jurisdictions, and a vice president of the company touted SBTech as being "very rooted in Asia."

7.    In late 2017, the United States Supreme Court heard a landmark case regarding a federal statute that prohibited states from implementing online gambling, and in May 2018, the Supreme Court ruled the statute unconstitutional under the Tenth Amendment, paving the way for the online gambling to take hold in the United States.[2]

8.    To seize new opportunities in the United States, SBTech sought to insulate itself from any appearance that it had engaged or was engaged in the Illicit Operations. To achieve that end, a "front" company was created. An SBTech executive departed shortly before the Supreme Court's 2018 decision and founded an entity called "BTi" later renamed "CoreTech" ("BTi/CoreTech") that would act as a "distributor" or "reseller" of SBTech operations and technology in Asian markets.

---

[2] *Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461 (2018).

9.      Despite this attempt to distance SBTech from the Illicit Operations, the separation was one of form, not substance. The relationship between SBTech and BTi/CoreTech was so close that one employee listed the company name as "BTiGroup – A SBTech Company" on his resume. Moreover, former employees acknowledged that an overwhelming majority of BTi/CoreTech's operations occurred in black and grey markets, where online gambling was restricted.

10.     Thus, despite attempts to distance SBTech from the Illicit Operations, the creation of BTi/CoreTech merely allowed SBTech, and later the Company after SBTech became a subsidiary following the April 2020 Merger, to continue engaging in the Illicit Operations.

11.     The truth regarding the Illicit Operations was revealed on June 15, 2021, when Hindenburg Research ("Hindenburg") published a report (the "Hindenburg Report" or "Report") detailing the Illicit Operations and concluding that SBTech had "a long and ongoing record of operating in black markets." The Report contained evidence of the close relationship between SBTech and BTi/CoreTech. Moreover, Hindenburg interviewed former employees of the companies who gave statements to the effect that BTi/CoreTech engaged in the Illicit Operations. The Report detailed SBTech's efforts to distance itself from its black-market dealings prior to the Merger, including by creating the "front" company BTi/CoreTech, which engaged in the Illicit Operations while ostensibly shielding SBTech and DraftKings from scrutiny.

12.     Following the release of the Report, the Company's share price fell $2.11, or 4.17% from its close price of $50.62 on June 14, 2021 to close at $48.51 per share on June 15, 2021.

13.     In breach of their fiduciary duties, the Individual Defendants engaged in or caused the Company to engage in the Illicit Operations, thereby exposing the Company to heightened risk of criminal or regulatory enforcement actions.

14.     Additionally, beginning on December 23, 2019 and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance

itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets even after the Merger; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company; (4) as a result of the foregoing, the Company had misstated its financial prospects, which were reliant in part upon SBTech's having engaged in the Illicit Operations; and (5) the Company failed to maintain adequate internal controls. Consequently, the Company's public statements were materially false and misleading at all relevant times.

15.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

16.     The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time at least seven Individual Defendants benefitted from lucrative insider sales at artificially inflated prices for proceeds of approximately $825.3 million. These seven of the Individual Defendants breached their fiduciary duties by selling shares at prices that were artificially inflated due to the Individual Defendants' conduct in engaging in the Illicit Operations or causing the Company to engage in the Illicit Operations, or in making and/or causing the Company to make materially false and misleading statements about the Company's business, operations, and prospects.

17.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls as is required by SEC regulations, DEAC's Code of Ethics, and the Company's own Audit Committee Charter, Compliance Committee Charter, and Code of Business Ethics (the "Code").

18.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), and the former CEO and former CFO of DEAC (the "Securities Class Action Defendants") to two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions") and which has further subjected the

Company to a subpoena from the SEC, the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Securities Class Action Defendants' liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 promulgated under the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District.

1   and Defendants' actions have had an effect in this District, and the Company is incorporated in

2   this District.

3   **PARTIES**

4   **Plaintiff**

5       25.    Plaintiff is a current shareholder of DraftKings. Plaintiff has continuously held

6   DraftKings common stock at all relevant times.

7   **Nominal Defendant DraftKings**

8       26.    DraftKings is a Nevada corporation with principal executive offices at 222

9   Berkeley Street, 5th Floor, Boston, Massachusetts 02116. DraftKings' class A common stock

10  ("Common Stock") trades on the NASDAQ Stock Market LLC ("NASDAQ") under the ticker

11  symbol "DKNG."

12  **Defendant Robins**

13      27.    Defendant Robins is the Company's President, CEO, and Chairman of the Board,

14  and he served as CEO of Old DK from its founding in 2011 until the Merger. According to the

15  Company's Schedule 14A filed with the SEC on March 19, 2021 (the "2021 Proxy Statement"),

16  Defendant Robins beneficially owned 16,610,874 shares of the Company's Common Stock and

17  393,013,951 shares of the Company's class B common stock.[3] Given that the closing price of the

18  Company's Common Stock was $68.72 on March 1, 2021, the 2021 Proxy Statement's Record

19  Date (the "Record Date"), Defendant Robins owned at least $1.14 billion of the Company's

20  Common Stock as of the Record Date.[4] As a result of his holdings of Common Stock and class B

21

22

23  [3] According to the 2021 Proxy Statement, Defendant "Robins is the beneficial owner of all the
    outstanding shares of [the Company's] Class B Shares." Class B common stock is entitled to ten
24  votes per share, compared to one vote per share of Common Stock. It is subject to strict transfer
    restrictions and cancellation provisions in the Company's Amended and Restated Articles of
25  Incorporation, such that its monetary value is negligible.

26  [4] The 2021 Proxy Statement does not specify the date upon which the Company's representations
    regarding beneficial ownership by officers and directors were calculated. In the absence of a
27  disclosure as to the date upon which beneficial ownership was calculated, the allegations in this
    complaint proceed as though the Company's representations regarding beneficial ownership were
28  calculated as of the Record Date, March 1, 2021.

common stock, Defendant Robins held 91.2% of the Company's total voting power.

28.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Robins received $236,833,375 million in compensation from the Company, which was comprised of $650,000 in salary, $2,980,000 in bonus, $231,178,101 in stock awards, $1,950,000 in non-equity incentive plan compensation, and $75,274 in all other compensation. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year") Defendant Robins received $4,439,689 in compensation from the Company, which was comprised of $400,000 in salary, $3,239,689 in option awards, $800,000 in non-equity incentive plan compensation.

29.     The 2021 Proxy Statement stated the following about Defendant Robins:

*Jason D. Robins* is our Chief Executive Officer and Chairman of the Board. Mr. Robins co-founded Old DK in December 2011 and served as its Chief Executive Officer from its inception to April 2020, and has served as our Chief Executive Officer and Chairman of the Board since April 2020. Mr. Robins oversees the Company's strategy and operations, while also driving financings and strategic initiatives. He has built a reputation for expanding DraftKings' reach across numerous platforms through wide-ranging, forward-thinking strategic relationships. Mr. Robins has led efforts at DraftKings to work with policy makers and regulators to pass fantasy sports, sports betting and iGaming legislation. Mr. Robins also serves on the board of directors of Extend, which is currently engaged in the business of providing extended warranty service contracts for consumer products, and FirstMark Horizon Acquisition Corp., a special-purpose acquisition company formed for the purpose of effecting a merger or similar business combination with one or more businesses primarily within technology industries located in the United States. Additionally, Mr. Robins serves as an advisor to the board of Data Point Management Company, which is engaged in the business of investing in data-driven companies that can be leveraged and scaled on the internet. Mr. Robins attended Duke University, where he received his B.S. in Economics and Computer Science.

**Defendant Park**

30.     Defendant Park joined Old DK as the company's CFO in June 2019. After the Merger, Defendant Park became CFO of DraftKings. He continues to hold that position. According to the 2021 Proxy Statement, Defendant Park beneficially owned 1,004,634 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Park owned over $69 million of Common Stock as of that date.

31.     For the 2020 Fiscal Year, Defendant Park received $56,108,859 in compensation

from the Company, which was comprised of $425,000 in salary, $1,000,000 in bonus, $53,825,309 in stock awards, $850,000 in non-equity incentive plan compensation, and $8,550 in all other compensation. For the 2019 Fiscal Year, Defendant Park received $3,118,307 in compensation from the Company, which was comprised of $201,923 in salary, $250,000 in bonus, $2,326,845 in option awards, $325,260 in non-equity incentive plan compensation, and $14,279 in all other compensation.

32.     The Company's annual report filed on March 31, 2021 on Form 10-K with the SEC stated the following about Defendant Park:

> ***Jason K. Park*** is our Chief Financial Officer. Mr. Park joined Old DK in that capacity in June 2019, and is responsible for the accounting, tax, treasury, financial planning and analysis and investor relations departments. Mr. Park also serves as a member of the board of directors of Pine Street Inn, a non-profit organization that partners with homeless individuals to help them find and retain housing; and Corner Growth Acquisition Corp. (Nasdaq: COOL.U) (since December 2020), a special-purpose acquisition company formed for the purpose of effecting a merger or similar business combination with one or more businesses primarily within technology industries. Prior to joining DraftKings, from January 2009 to June 2019, Mr. Park worked at Bain Capital Private Equity ("Bain Capital") where he was an Operating Partner and focused on technology investments. For more than 10 years, Mr. Park worked collaboratively with chief executive officers, chief financial officers and management teams to develop and achieve value creation plans. Before Bain Capital, Mr. Park was an Associate Partner at McKinsey & Company. Mr. Park has previously served as a director of Central Square Technologies. Mr. Park received his MBA from the Wharton School at the University of Pennsylvania and a MAcc (Master of Accountancy) and a B.B.A. from the University of Michigan.

**Defendant Sagansky**

33.     Defendant Sagansky served as the CEO and Chairman of DEAC from March 2019 until the Merger. According to the Company's Schedule 14A filed by DEAC with the SEC on April 15, 2020 (the "2020 Proxy Statement"), Defendant Sagansky held 5,020,000 shares, or 10%, of DEAC common stock prior to the April 23, 2020 Merger and 2,718,529 shares of Common Stock after the Merger.[5] Given that the price per share of the Common Stock closed at $19.35 on

---

[5] Representations pertaining to the number of shares held by DEAC officers and directors Sagansky, Baker, Delman, Kazam, Rosen, and Ross following the Merger assume that, in

1   April 24, 2020, Defendant Sagansky owned approximately $52.6 million of Common Stock as of

2   that date.

3       34.     An annual report filed by DEAC on Form 10-K with the SEC on March 12, 2020

4   (the "2019 10-K") stated the following about Defendant Sagansky:

> **Jeff Sagansky** has been our Chief Executive Officer and Chairman since
> March 2019. Mr. Sagansky served as the Chief Executive Officer and chairman of
> Platinum Eagle Acquisition Corp. ("Platinum Eagle") from December 2017 until
> the consummation of its business combination with Target Logistics Management,
> LLC and RL Signor Holdings, LLC in March 2019. Platinum Eagle changed its
> name to Target Hospitality Corp. ("Target Hospitality") (Nasdaq: TH) in
> connection with the business combination and Mr. Sagansky continues to serve as
> a member of Target Hospitality's board of directors. Mr. Sagansky has been a
> director of WillScot Corporation (Nasdaq: WSC) since Double Eagle Acquisition
> Corp. ("Double Eagle") was formed on June 26, 2015 and served as Double Eagle's
> President and Chief Executive Officer from August 6, 2015 until the consummation
> of its business combination in November 2017. Mr. Sagansky currently serves as
> co-founder and chairman of Hemisphere Capital Management LLC, a private
> motion picture and television finance company. Mr. Sagansky co-founded, together
> with Mr. Sloan, Global Eagle Acquisition Corp. ("GEAC"), which completed its
> business combination with Row 44 and AIA in January 2013. GEAC changed its
> name to Global Eagle Entertainment Inc. ("GEE") (Nasdaq: ENT) in connection
> with its business combination and is currently a worldwide provider of media
> content, connectivity systems and operational data solutions to the travel industry.
> Mr. Sagansky served as GEAC's president from February 2011 through
> January 2013. He also co-founded, together with Mr. Sloan, Silver Eagle
> Acquisition Corp. ("Silver Eagle"), which invested approximately $273.3 million
> in Videocon d2h in exchange for equity shares of Videocon d2h represented by
> ADSs in March 2015. In March 2018, Videocon d2h merged with and into Dish
> TV India Limited (NSE: DISHTV). Mr. Sagansky served as Silver Eagle's
> president from April 2013 through March 2015.
>
> Mr. Sagansky was formerly chief executive officer and then vice chairman of
> Paxson Communications Corporation from 1998 to 2003, where he launched the
> PAX TV program network in 1998. Under his leadership, PAX TV became a highly
> rated family-friendly television network with distribution growing from 60% of
> U.S. television households to almost 90% in only four years. In addition,
> Mr. Sagansky drove substantial improvement in the network's financial
> performance with compounded annual revenue growth of 24% and compounded
> annual gross income growth of 30% from 1998 to 2002. Prior to joining Pax,
> Mr. Sagansky was co-president of Sony Pictures Entertainment ("SPE") from 1996

---

28  conjunction with the Merger, stockholders holding 30,564,789 DEAC public shares exercised their
redemption rights for their pro rata share of the funds in DEAC's trust account.

to 1998 where he was responsible for SPE's strategic planning and worldwide television operations. While at SPE, he spearheaded SPE's acquisition, in partnership with Liberty Media Corporation and other investors, of Telemundo Network Group, LLC, or Telemundo. The transaction generated significant returns for SPE as Telemundo was sold to the National Broadcasting Company, Inc., for over six times its original investment less than three years later. Previously, as executive vice president of Sony Corporation of America ("SCA"). Mr. Sagansky oversaw the 1997 merger of SCA's Loews Theaters unit with the Cineplex Odeon Corporation to create one of the world's largest movie theater companies, and the highly successful U.S. launch of the Sony PlayStation video game console. Prior to joining SCA, Mr. Sagansky was president of CBS Entertainment from 1990 to 1994, where he engineered CBS' ratings rise from third to first place in 18 months. Mr. Sagansky previously served as president of production and then president of TriStar Pictures, where he developed and oversaw production of a wide variety of successful films.

Mr. Sagansky graduated with a BA from Harvard College and an MBA from Harvard Business School. He also serves on the boards of GEE and GoEuro.

**Defendant Baker**

35.     Defendant Baker served as a President, CFO, and Secretary of DEAC from March 2019 until the Merger. According to the 2020 Proxy Statement, Defendant Baker held 5,020,000, or 10%, of DEAC common stock prior to the April 23, 2020 Merger and 2,718,529 shares of Common Stock after the April 23, 2020 Merger. Given that the price per share of the Common Stock closed at $19.35 on April 24, 2020, Defendant Baker owned approximately $52.6 million of Common Stock as of that date.

36.     The 2019 10-K stated the following about Defendant Baker:

*Eli Baker* has been our President, Chief Financial Officer and Secretary since March 2019. Mr. Baker served as the president, chief financial officer and secretary of Platinum Eagle from July 2017 until the consummation of its business combination in March 2019, and has served as a member of Target Hospitality's board of directors since March 2019. Mr. Baker served as Double Eagle's vice president, general counsel and secretary from June 2015 through its business combination in November 2017. Mr. Baker was also a director of Silver Eagle from July 2014 through Silver Eagle's business combination in March 2015. Mr. Baker is a co-founder and partner of Manifest Investment Partners, LLC, a growth equity/venture fund that focuses on early stage technology-enabled businesses, where he has served since June 2016. Mr. Baker continues to be co-managing director and a partner in Hemisphere Capital Management LLC, a private motion picture and television finance company where he has been since May 2009. Previously, Mr. Baker served as a principal at Grosvenor Park Investors from 2007 to 2009, a joint venture with Fortress Investment Group where he shared oversight over the special opportunity credit/debt funds in the media space. Mr. Baker is a former lawyer, and has served in a legal affairs capacity at various companies in

12

and out of the media business. Mr. Baker earned a Bachelor of Arts degree from the University of California, Berkeley and a Juris Doctor from the University of California at Hastings Law School and is a member of the California State Bar.

**Defendant Delman**

37.     Defendant Delman served as a director of DEAC from December 2019 until the Merger. According to the 2020 Proxy Statement, Defendant Delman held 20,000 shares of DEAC common stock prior to the April 23, 2020 Merger and 86,666 shares of Common Stock after the Merger. Given that the price per share of the Common Stock closed at $19.35 on April 24, 2020, Defendant Delman owned approximately $1.68 million of Common Stock as of that date.

38.     The 2019 10-K stated the following about Defendant Delman:

Scott M. Delman has served on DEAC's board of directors since December 2019. Mr. Delman is the founder of Blue Spruce Productions, a producer of top Broadway and West End theatrical events, and is also the Managing Partner of DGZ Capital, a private equity firm that acquires ownership stakes in alternative investment firms ("DGZ"). Prior to forming DGZ, Mr. Delman was co-founder and President of Capital Z Investments, where he initiated and managed a multi-billion-dollar investment program to sponsor the creation of new alternative asset management companies. Capital Z Investments has invested over $2.0 billion in more than 25 investment firms throughout North America, Europe and Asia.

Mr. Delman has served on the boards and advisory councils of various academic, corporate, cultural and public policy organizations such as Third Way, the New America Foundation, The Truman Project, Manhattan Theatre Club, Yale Drama School and the Williamstown Theatre Festival. Mr. Delman graduated with honors from Yale College in 1982 and received an MBA from Harvard Business School in 1986. Mr. Delman also served as a Visiting Senior Fellow at Harvard University's JFK School for Government in 2006 and 2007, where he focused on the intersection between international capital markets and national security.

**Defendant Kazam**

39.     Defendant Kazam served as a director of DEAC from the IPO until the Merger. According to the 2020 Proxy Statement, Defendant Kazam held 20,000 shares of DEAC common stock prior to the April 23, 2020 Merger and 153,333 shares of Common Stock after the April 23, 2020 Merger. Given that the price per share of the Common Stock closed at $19.35 on April 24, 2020, Defendant Kazam owned approximately $3 million of Common Stock as of that date.

40.     The 2019 10-K stated the following about Defendant Kazam:

*Joshua Kazam* has served on DEAC's board of directors since the completion of its initial public offering. Mr. Kazam served as a director of Platinum Eagle from its initial public offering through the completion of its initial business combination in March 2019. Mr. Kazam is a co-founder and has been a Partner of Two River Consulting, LLC ("Two River") since June 2009. Prior to founding Two River, he served as Managing Director of a life science focused venture capital firm from 1999 to 2004, where he was responsible for ongoing operations of venture investments. Mr. Kazam co-founded and served on the Board of Directors of Kite Pharma, Inc. from its inception in 2009 until it was acquired by Gilead Sciences Inc. (Nasdaq: GILD) in October 2017. He has also served on the Board of Directors of Capricor Therapeutics Inc. (Nasdaq: CAPR) since its inception in 2007. Mr. Kazam also serves as a director of several privately held companies, including Hubble Contacts. Mr. Kazam is a Member of the Wharton School's Undergraduate Executive Board and serves on the Board of Directors of the Desert Flower Foundation. Mr. Kazam received his B.S. in Economics from the Wharton School of the University of Pennsylvania.

**Defendant Rosen**

41.     Defendant Rosen served as a director of DEAC from the IPO until the Merger. According to the 2020 Proxy Statement, Defendant Rosen held 20,000 shares of DEAC common stock prior to the April 23, 2020 Merger and 153,333 shares of Common Stock after the Merger. Given that the price per share of the Common Stock closed at $19.35 on April 24, 2020, Defendant Rosen owned approximately $3 million of Common Stock as of that date.

42.     The 2019 10-K stated the following about Defendant Rosen:

*Fredric D. Rosen* has served on DEAC's board of directors since the completion of its initial public offering. Mr. Rosen served as a director of Platinum Eagle from its initial public offering through the completion of its initial business combination in March 2019. Mr. Rosen has been a director of Will Scot Corporation since the closing of Double Eagle's initial business combination in September 2015. Mr. Rosen was the Co-CEO of Outbox Enterprises, LLC, an entity comprised of Outbox Technology, Cirque du Soleil and Anschutz Entertainment Group, from September 2010 until February 2012. Mr. Rosen remained a principal in the enterprise until he sold his interests in October 2014. Since February 2012, Mr. Rosen has been a self-employed consultant. Mr. Rosen was the President and CEO of Ticketmaster Group, Inc. from 1982 to 1998. Mr. Rosen served as Chairman and CEO of Stone Canyon Entertainment, an operator of traveling amusement parks, from 2005 to 2008. Mr. Rosen has served as a director of Exari Group, Inc., a provider of cloud-based software for contract management, since May 2011. He served as a director of Prime Focus World, NV, a filmmaking partner to studios and film production companies, from August 2012 to June 2015. Mr. Rosen served as a trustee of Crossroads School for 16 years and was a board member of the Los Angeles Sports and Entertainment Commission for 15 years and now serves on its advisory board. He was a founding board member of the Wallis Annenberg Cultural Center in

Beverly Hills and is currently a member of the Board of Governors of Cedars-Sinai Medical Center. Mr. Rosen is also currently a board member of the Pacific Council and The American Academy of Dramatic Arts.

Mr. Rosen received his Bachelor of Arts degree from Clark University in June 1965 and his Juris Doctor from Brooklyn Law School in June 1969. He was admitted and became a member of the New York State Bar in November 1969 and practiced law in New York City from 1972 to 1982.

**Defendant Ross**

43.     Defendant Ross served as a director of DEAC from December 2019 until the Merger. According to the 2020 Proxy Statement, Defendant Ross held 20,000 shares of DEAC common stock prior to the April 23, 2020 Merger and 20,000 shares of Common Stock after the Merger. Given that the price per share of the Common Stock closed at $19.35 on April 24, 2020, Defendant Ross owned approximately $387,000 of Common Stock as of that date.

44.     The 2019 10-K stated the following about Defendant Ross:

*Scott I. Ross* has served on DEAC's board of directors since December 2019. Mr. Ross is the founder and Managing Partner of Hill Path Capital. Mr. Ross was previously a Partner at Apollo Management ("Apollo"), which he joined in 2004, responsible for private equity and debt investments in the lodging, leisure, entertainment, consumer and business services sectors. Prior to Apollo, Mr. Ross was a member of the Principal Investment Area in the Merchant Banking Division of Goldman, Sachs & Co. and a Member of the Principal Finance Group in the Fixed Income, Currencies, and Commodities Division of Goldman, Sachs & Co. Mr. Ross was employed by Shumway Capital Partners from August 2008 to September 2009. Mr. Ross currently serves on the boards of directors of Sea World Entertainment, Inc. and Great Wolf Resorts, Inc. and has previously served on the boards of directors of EVERTEC, Inc. and CEC Entertainment, Inc. (the parent company of Chuck E. Cheese's). Mr. Ross graduated magna cum laude from Georgetown University with a B.A. degree in Economics.

We believe Mr. Ross is qualified to serve on our board of directors due to his extensive experience leading private equity transactions in the entertainment and leisure industries and his service as director of several public companies.

**Defendant Isaacs**

45.     Defendant Isaacs served as a director of DraftKings from the time of the Merger until the Company's annual meeting on April 28, 2021 (the "2021 Annual Meeting"). During that time, he was a member of the Compliance Committee. According to the 2021 Proxy Statement,

15

Defendant Isaacs beneficially owned 651,799 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Isaacs owned approximately $44.8 million of Common Stock as of that date.

46.    For the 2020 Fiscal Year, Defendant Isaacs received $374,516 in compensation from the Company, which was comprised entirely of stock awards.

47.    The 2020 Proxy Statement stated the following about Defendant Isaacs:

*Michael Gavin (Gavin) Isaacs* currently serves as the non-executive Chairman of the board of directors of SB Tech (Global) Limited (since January 2019) and as a member of the board of directors of Galaxy Gaming, Inc. ("Galaxy Gaming"; OTCMKTS: GLXZ) (since June 2019), a public company which develops and distributes casino table games and enhanced systems. During his tenure at SBT, he has assisted in the company's successful entry into the U.S. gaming market to become the exclusive statewide provider for the Oregon State Lottery. Since December 2018, Mr. Isaacs has worked as an independent consultant, advising companies, including Galaxy Gaming, on strategy, market development and execution-oriented deliverables. Previously, Mr. Isaacs served as Vice Chairman of the board of directors of Scientific Games Corporation ("Scientific Games") between August 2016 and December 2018, and prior to that was President and Chief Executive Officer of Scientific Games from June 2014 until August 2016. Prior to 2014, Mr. Isaacs served as Chief Executive Officer of SHFL Entertainment, Inc. and served as Executive Vice President and Chief Operating Officer of Bally from 2006 through 2011. Mr. Isaacs is currently Counsellor of the International Association of Gaming Advisors, having previously served as the President of the association. In addition, he previously served as Vice Chairman of the board of directors of the American Gaming Association. Mr. Isaacs received his LL.M. from the University of Sydney and his LL.B. and BCommerce in Accounting and Financial Systems from the University of New South Wales.

**Defendant Kalish**

48.    Defendant Kalish is President of DraftKings North America and has served as a director of DraftKings since the Merger. He also served as a director of Old DK from its inception until the Merger. According to the 2021 Proxy Statement, Defendant Kalish beneficially owned 6,353,881 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Kalish owned approximately $437 million of Common Stock as of that date.

49.    For the 2020 Fiscal Year, Defendant Kalish received $197,235,333 in compensation from the Company and Old DK, which was comprised of $425,000 in salary,

$1,500,000 in bonus, $194,210,935 in stock awards, $1,062,500 in non-equity incentive plan compensation, and $36,898 in all other compensation. For the 2019 Fiscal Year, Defendant Kalish received $2,114,748 in compensation from Old DK, which was comprised of $300,000 in salary, $1,326,348 in option awards, $480,000 in non-equity incentive plan compensation, and $8,400 in all other compensation.

50.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kalish made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 11, 2021 | 57,692 | $53.91 | $3,110,175.72 |

51.     The 2021 Proxy Statement stated the following about Defendant Kalish:

*Matthew Kalish* is our President, DraftKings North America, and a director. Mr. Kalish co-founded Old DK and served as its Chief Revenue Officer from 2014 until December 2019. In December 2019, Mr. Kalish was appointed President, DraftKings North America. Mr. Kalish served as a director of Old DK from its inception to April 2020 and has served on our Board since April 2020. Mr. Kalish's purview has grown consistently to now oversee the performance of DraftKings' DFS, Sportsbook and iGaming offerings, and he leads DraftKings' operations, marketing, analytics and customer experience departments. Mr. Kalish focuses on developing and managing high-performing offerings and promotions that users love, and bringing those offerings to market in order to drive user base growth and loyalty. The innovation under Mr. Kalish's guidance has helped DraftKings grow its customer base significantly. Under Mr. Kalish's oversight, DraftKings has grown to offer a broad variety of sports and game variants in DFS as well as highly competitive Sportsbook and iGaming offerings, which have resulted in DraftKings achieving a market leadership position in the rapidly expanding U.S. real-money gaming landscape. Mr. Kalish's passion for sports, analytics and game design has been instrumental in growing DraftKings from a small Boston start-up to a digital sports and entertainment enterprise. Mr. Kalish received his MBA from Boston College and his B.A. in Computer Science and Economics from Columbia University.

**Defendant Levin**

52.     Defendant Levin has served as a director of DraftKings since the Merger and served as a director of Old DK from December 2013 to April 2020. According to the 2021 Proxy Statement, Defendant Levin beneficially owned 392,881 shares of the Company's Common Stock

as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Levin owned approximately $27 million of Common Stock as of that date.

53.     For the 2020 Fiscal Year, Defendant Levin received $375,893 in compensation from the Company, which was comprised entirely of stock awards.

54.     The 2021 Proxy Statement stated the following about Defendant Levin:
> **Woodrow H. Levin** is the founder and has served as Chief Executive Officer of Extend, Inc. ("Extend"), which offers an API-first solution for merchants to offer extended warranties and protection plans, and 3.0 Capital GP, LLC, which is a multi-strategy crypto asset hedge fund. Mr. Levin served as a director of Old DK from December 2013 to April 2020 and has served on our Board since April 2020. Prior to founding Extend in November 2018 and 3.0 Capital GP, LLC in December 2017, Mr. Levin served as Vice President of growth at DocuSign, Inc., which allows organizations to digitally prepare, sign, act on, and manage agreements. In addition, Mr. Levin served as the founder and Chief Executive Officer of Estate Assist, Inc., from February 2014 to September 2015 (at which time it was acquired), which offers digital estate planning assistance and BringIt, Inc., from June 2009 to September 2012 (at which time it was acquired), which provides a virtual currency casino and arcade. Mr. Levin served as Director Emerging Business - Office of the CTO at International Game Technology, Inc., which manufactured and distributed slot machines and other gaming technology. Mr. Levin currently serves as a member of the board of directors of Extend (since November 2018). He received his J.D. from Chicago-Kent College of Law, Illinois Institute of Technology, and his B.A. from the University of Wisconsin.

**Defendant Liberman**

55.     Defendant Liberman is a cofounder of Old DK and currently serves as DraftKings' President of Global Technology and Product. Additionally, he has served as a director since the Merger, during which time he also served as a member of the Compliance Committee. According to the 2021 Proxy Statement, Defendant Liberman beneficially owned 6,954,105 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Liberman owned approximately $478 million of Common Stock as of that date.

56.     For the 2020 Fiscal Year, Defendant Liberman received $197,220,479 in compensation from the Company and Old DK, which was comprised of $425,000 in salary, $1,500,000 in bonus, $194,210,935 in stock awards, $1,062,500 in non-equity incentive plan compensation, and $22,044 in all other compensation. For the 2019 Fiscal Year, Defendant

Liberman received $2,139,948 in compensation from Old DK, which was comprised of $300,000 in salary, $1,350,348 in option awards, $480,000 in non-equity incentive plan compensation, and $9,600 in all other compensation.

57.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Liberman made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 10, 2021 | 85,000 | $53.82 | $4,574,700 |

58.    The 2021 Proxy Statement stated the following about Defendant Liberman:

**Paul Liberman** is our President, Global Technology and Product, and a director. Mr. Liberman co-founded Old DK in December 2011 and served as its Chief Operations Officer ("COO") from 2015 to December 2019. In December 2019, Mr. Liberman was appointed President, Global Technology and Product. Mr. Liberman served as a director of Old DK since its inception and has served on our Board since April 2020. He oversees our product development while leading efforts in maintaining the Company's current product set. He acted as Old DK's Chief Technology Officer from 2011 to 2013 and subsequently acted as its Chief Marketing Officer before becoming COO. Mr. Liberman's data-driven mindset has been instrumental in growing DraftKings from a small Boston start-up to a digital sports and entertainment enterprise. Under his leadership, Mr. Liberman's team has developed award-winning, stand-alone apps and product offerings including DraftKings' DK Live and Leagues, DraftKings Daily Fantasy Sports app and, most recently, the DraftKings Sportsbook platform. Mr. Liberman also serves as an advisor to Extend, providing input and guidance on product and strategy. Mr. Liberman attended Worcester Polytechnic Institute where he received a B.S. in Electrical Engineering and minor in Computer Science.

**Defendant Meckenzie**

59.    Defendant Meckenzie is the founder of SBTech. He served as a director of Old DK from December 2013 until April 2020 and has been a director of DraftKings since the Merger. According to the 2021 Proxy Statement, Defendant Meckenzie beneficially owned 22,387,536 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Meckenzie owned approximately $1.54 billion million of Common Stock as of that date.

60.    For the 2020 Fiscal Year, Defendant Meckenzie received $373,618 in

compensation from the Company, which consisted entirely of stock awards.

61.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Meckenzie made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| October 9, 2020 | 6,949,088 | $50.83 | $353,222,143.04 |
| January 21, 2021 | 660,000 | $51.79 | $34,181,400.00 |

62.     The 2021 Proxy Statement stated the following about Defendant Meckenzie:

**Shalom Meckenzie** is an entrepreneur who founded SBTech in July 2007 and served as a director until May 2014. Mr. Meckenzie served as a director of Old DK from December 2013 to April 2020 and has served on our Board since April 2020. He currently serves as a member of the board of directors of A.L. Skyshield Ltd (since May 2014) which is a holding company for real estate property. Mr. Meckenzie also served as a member of the board of directors of Gaming Tech Ltd., from June 2003 until January 2018, which is a subsidiary of SBTech that provides general and administration, marketing support and research and development services.

**Defendant J. Moore**

63.     Defendant J. Moore has served as a director of DraftKings since her appointment on September 23, 2020. She joined the Compliance Committee after the 2021 Annual Meeting. According to the 2021 Proxy Statement, Defendant J. Moore beneficially owned 3,990 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant J. Moore owned approximately $274,192 of Common Stock as of that date.

64.     For the 2020 Fiscal Year, Defendant J. Moore received $199,979 in compensation from the Company, which was comprised entirely of stock awards.

65.     The 2021 Proxy Statement stated the following about Defendant J. Moore:

**Jocelyn Moore** has served on our Board since September 2020 and is currently a Venture Partner at Ozone X Ventures in New York and serves as the Executive-in-Residence at The Gathering Spot in Atlanta. With experience working across multiple disciplines, Ms. Moore advises CEOs, executive teams and boards of directors on strategic communications, crisis and risk management, regulatory affairs, corporate social responsibility, operations, organizational change and

diversity. Previously, from June 2018 until April 2020, Ms. Moore was Executive Vice President of Communications and Public Affairs at the National Football League ("NFL"). As the NFL's Global Chief Communications Officer, she was a member of the executive leadership team and responsible for managing the league's corporate affairs. From July 2016 to June 2018, Ms. Moore was Senior Vice President of Public Policy and Government Affairs at the NFL. As Head of the NFL's Washington, D.C. office, she led the league's public policy agenda and managed the league's political action committee. Prior to joining the NFL, from September 2015 until July 2016, Ms. Moore served as a Managing Director of The Glover Park Group, a leading national communications and government affairs consulting firm. She also spent 15 years in various staff positions in the United States Senate, most recently as the Deputy Staff Director of the Senate Finance Committee. Ms. Moore is a member of the West Virginia University Health System Board of Directors, where she serves on the Quality & Patient Safety Committee. She serves on the University of Florida Foundation National Board of Directors, where she is a member of the audit committee, as well as on the University of Florida Alumni Association Board of Directors, where she is a member of the Executive Committee. Ms. Moore is also a member of the Board of Directors of International Social Service, USA, located in Baltimore, Maryland, and the DC Rape Crisis Center in Washington, D.C. Ms. Moore holds a B.A. in English and an M.Ed. in Student Personnel in Higher Education, both from the University of Florida.

**Defendant R. Moore**

66.     Defendant R. Moore served as a director of Old DK from February 2012 until April 2020 and has been a director of DraftKings' Board since the Merger. Since the Merger, he has served as a member of the Audit Committee. According to the 2021 Proxy Statement, Defendant R. Moore beneficially owned 8,552,669 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant R. Moore owned approximately $588 million of Common Stock as of that date.

67.     For the 2020 Fiscal Year, Defendant R. Moore received $376,790 in compensation from the Company, which was comprised entirely of stock awards.

68.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant R. Moore made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| October 9, 2020 | 1,000,000 | $50.83 | $50,830,000 |

69.     The 2021 Proxy Statement stated the following about Defendant R. Moore:

**Ryan R. Moore** co-founded Accomplice Management, LLC, a venture capital firm, in January 2015 and is a founding investor in several technology companies. Mr. Moore served as a director of Old DK from February 2012 to April 2020 and has served on our Board since April 2020. He currently sits on the board of several privately held companies. Mr. Moore began his career at SoftBank Capital Partners LP ("Softbank"), a venture capital firm. Later, he was investment team member of GrandBanks Capital, which invested primarily in early stage technology companies. He joined Atlas Advisors, Inc., the predecessor to Accomplice, which focuses its investments on early-stage companies, where he was a Partner from August 2011 to December of 2014. Mr. Moore received his A.B. in Economics from Princeton University.

**Defendant Mosley**

70.     Defendant Mosley has served as a director of DraftKings since her appointment on September 23, 2020, when she joined the Audit Committee. According to the 2021 Proxy Statement, Defendant Mosley beneficially owned 3,990 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Mosley owned approximately $274,192 of Common Stock as of that date.

71.     For the 2020 Fiscal Year, Defendant Mosley received $199,979 in compensation from the Company, which was comprised entirely of stock awards.

72.     The 2021 Proxy Statement stated the following about Defendant Mosley:

**Valerie Mosley** has served on our Board since September 2020 and is the founder and Chief Executive Officer of Upward Wealth, a wealth-tech platform that helps hardworking Americans grow their net worth. Ms. Mosley advises and invests in companies that add value to investors and society through Valmo Ventures. Ms. Mosley has been with Upward Wealth since 2012. Previously, from January 1992 until June 2012, Ms. Mosley served in multiple roles at Wellington Management Company, LLP ("Wellington Management"), a trillion-dollar global money management firm, including as Senior Vice President, Partner, Portfolio Manager and Investment Strategist. During her 20-year tenure at Wellington Management, she directly managed billions of dollars for clients and also chaired the firm's Industry Strategy Group, charged with taking a long-term perspective to identify headwinds and tailwinds impacting industries. Ms. Mosley began her career at Chase Manhattan Bank, where she was a Commercial Lending Officer for financial institutions. She also worked in institutional corporate bond sales at Kidder Peabody and at P.G. Corbin Asset Management as its Chief Investment Officer before moving on to Wellington Management. Ms. Mosley currently serves on the Board of Directors of Eaton Vance's family of mutual funds, where she is

22

chair of the governance committee and a member of the investment committee and audit committee, Dynex Capital, Inc. (NYSE: DX), a mortgage REIT, where she is a member of the nominating committee and investment committee, Groupon, Inc. (Nasdaq: GRPN), an online marketplace company, where she is a member of the nominating committee, Envestnet, Inc. (NYSE: ENV), a wealth management services and technology company, where she is a member of the nominating and governance committee and compliance and information security committee and Progress Investment Management Company, a privately held Fund of Funds. Ms. Mosley also serves on New York State's Common Retirement Pension Fund Investment Advisory Committee and the UAE Retiree Medical Benefits Trust's Investment Risk Advisory Committee. In addition, she also serves on the Board of New Profit, a philanthropic venture firm, and is a founding member of the American Red Cross of Massachusetts Bay Tiffany Circle Society of Women Leaders. Ms. Mosley holds a B.A. in History from Duke University and a M.B.A. from the Wharton School of Business at the University of Pennsylvania, with a specialty in finance.

**Defendant Murray**

73.     Defendant Murray served as a director of Old DK from August 2016 until April 2020 and has been a director of DraftKings and a member of the Company's Audit Committee since the Merger. According to the 2021 Proxy Statement, Defendant Murray beneficially owned 5,264,443 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Murray owned approximately $361.8 million of Common Stock as of that date.

74.     For the 2020 Fiscal Year, Defendant Murray received $378,136 in compensation from the Company, which was comprised entirely of stock awards.

75.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murray made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| October 9, 2020 | 1,545,924 | $50.83 | $78,579,316.92 |

76.     The 2021 Proxy Statement stated the following about Defendant Murray:

**Steven J. Murray** is the Managing Partner of Revolution Growth III, LP (together with its affiliates, "Revolution"), a venture capital firm, where he has worked since January 2016. Mr. Murray served as a director of Old DK from August 2016 to April 2020 and has served on our Board since April 2020. Prior to joining Revolution, Mr. Murray worked for Softbank, a venture capital firm, from

April 1996 to January 2016, where he most recently served as a Partner. Prior to joining Softbank, he worked for Deloitte & Touche LLP, where he specialized in high-growth technology based businesses. Mr. Murray currently serves as a member of the board of directors of a number of private Revolution portfolio companies, including: BigCommerce, Inc. (since June 2018) where he sits on the audit committee, which is the world's leading open SaaS ecommerce platform for fast-growing and established brands; Convene Holding Company LLC (since June 2018), which offers full-service, technology-enabled meeting, event and flexible workspaces; Glowforge Inc. (since August 2019), which manufactures 3D laser printers; Interactions Corporation (since June 2013), which uses artificial intelligence to create virtual assistant customer service products for companies; and InVenture Capital Corporation d/b/a Tala (since March 2018), which provides financial products and services to underbanked individuals in developing nations. From June 2013 until January 2021, Mr. Murray served as a member of the board of directors of Fitbit, Inc. (NYSE: FIT), which offers wireless-enabled wearable technology devices and activity trackers. Mr. Murray received his B.S. in Accounting from Boston College in 1990.

**Defendant Nada**

77.     Defendant Nada served as a director of Old DK from August 2016 until April 2020 and has been a director of DraftKings and a member of the Company's Audit Committee since the Merger. According to the 2021 Proxy Statement, Defendant Nada beneficially owned 5,376,519 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Nada owned approximately $369.5 million of Common Stock as of that date.

78.     For the 2020 Fiscal Year, Defendant Nada received $394,656 in compensation from the Company, which was comprised of $378,585 in stock awards and $16,071 in all other compensation.

79.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Nada made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| October 9, 2020 | 946,712 | $50.83 | $48,121,370.96 |

80.     The 2021 Proxy Statement stated the following about Defendant Nada:

**Hany M. Nada** co-founded ACME Capital, a venture capital firm, in January 2019 and serves as a member of its board of directors and as one of the firm's partners.

Mr. Nada served as a director of Old DK from August 2016 to April 2020 and has served on our Board since April 2020. Prior to co-founding ACME Capital, Mr. Nada co-founded GGV Capital LLC (formerly Granite Global Ventures, "GGV"), a venture capital firm, in 2000, and served as a Managing Director at the firm from 2000 until October 2016 and as a Venture Partner from November 2016 until October 2018. Prior to co-founding GGV, Mr. Nada served as Managing Director and Senior Research Analyst at Piper Sandler & Co. f/k/a Piper Jaffray & Co, an investment banking firm, specializing in Internet software and e-infrastructure. Mr. Nada currently serves as a member of the board of directors of several companies, including: Glu Mobile (Nasdaq: GLUU) (since April 2005), in which he sits on the audit committee, compensation committee and strategy committee; ArchByte (since December 2019), and Vocera Communications, Inc. and Tudou, both publicly traded companies. In addition, Mr. Nada is an observer on the board of directors of Houzz, Inc, IonQ and Uhnder. Mr. Nada received his B.S. in Economics and his B.A. in Political Science from the University of Minnesota.

**Defendant Rosenblatt**

81.    Defendant Rosenblatt served as a director of Old DK from January 2018 until April 2020 and served as a director of DraftKings' Board from the Merger until the 2021 Annual Meeting. According to the 2021 Proxy Statement, Defendant Rosenblatt beneficially owned 217,750 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Rosenblatt owned approximately $15 million of Common Stock as of that date.

82.    For the 2020 Fiscal Year, Defendant Rosenblatt received $374,964 in compensation from the Company, which was comprised entirely of stock awards.

83.    The 2020 Proxy Statement stated the following about Defendant Rosenblatt: ***Richard Rosenblatt*** is a serial entrepreneur who has built, operated and sold several high-profile Internet media companies, including Demand Media Inc. ("Demand Media"), iCrossing, Inc., Intermix Media, Inc. ("Intermix"), Myspace LLC and iMall. He co-founded Whip Media Group ("Whip Media") in 2014 and currently serves as its Chairman and CEO. Whip's companies, including Mediamorph, TV Time and TheTVDB, which offer a data-driven integrated cloud solution that empowers the world's leading entertainment companies to efficiently acquire, distribute and monetize their content. Prior to co-founding Whip Media, Mr. Rosenblatt co-founded Demand Media, and served as Chairman and Chief Executive Officer. During his tenure, Demand Media went public in January 2011, with a valuation greater than $2 billion. Prior Demand Media, Mr. Rosenblatt served as the Chief Executive Officer of Intermix and Chairman of Myspace. In addition, he serves as a senior advisor to The Raine Group LLC (since November 2013), an integrated merchant bank focused on technology, media and telecommunications, and as a member of the board of directors of DraftKings (since January 2018) and Imagine Films Entertainment LLC (since April 2016), a film

25

and television production company. Mr. Rosenblatt received his J.D. from the University of Southern California Gould School of Law and his B.A., Phi Beta Kappa, from the University of California, Los Angeles.

**Defendant Salter**

84.     Defendant Salter served as a director of Old DK from August 2014 until April 2020 and has been a director of DraftKings and a member of the Company's Compliance Committee since the Merger. According to the 2021 Proxy Statement, Defendant Salter beneficially owned 16,907,236 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Salter owned approximately $1.16 billion of Common Stock as of that date.

85.     For the 2020 Fiscal Year, Defendant Salter received $389,836 in compensation from the Company, which was comprised of $376,342 in stock awards and $13,494 in all other compensation.

86.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Salter made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| October 9, 2020 | 4,972,572 | $50.83 | $252,755,834.76 |

87.     The 2021 Proxy Statement stated the following about Defendant Salter:

**John S. Salter** is a co-founder and partner of Raine, an integrated merchant bank advising and investing in high growth sectors of technology, media and telecommunications, where he is responsible for Raine's digital media and gaming practice. Mr. Salter served as a director of Old DK from August 2014 to April 2020 and has served on our Board since April 2020. Prior to co-founding Raine in May 2009, he was the Global Head of Digital Media at UBS Investment Bank in the Technology, Media and Telecommunications Group. Prior to joining UBS Investment Bank, Mr. Salter worked for Volpe, Brown, Whelan & Co., a boutique investment bank focused on technology and health care companies. In addition, he serves as a member of the board of directors of the following portfolio companies of Raine's investment management arm: Zumba Fitness (since February 2012), which is a global leader in dance fitness; Huuuge Games (since September 2017), which develops casual video games played on mobile devices and PCs; Beachbody (since December 2018), a creator of premium at-home fitness programs and nutritional products; and Play Games 24x7 (since October 2019), one of India's largest gaming companies. Mr. Salter received his B.A. from Stanford University.

**Defendant Sloan**

88.     Defendant Sloan was a founding investor of DEAC and has served as a director of DraftKings since the Merger. He also serves as Vice Chairman. According to the 2020 Proxy Statement, Defendant Sloan held 4,900,000 shares, or 9.8%, of DEAC common stock prior to the April 23, 2020 Merger. According to the 2021 Proxy Statement, Defendant Sloan beneficially owned 2,742,130 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Sloan owned approximately $188.4 million of Common Stock as of that date.

89.     For the 2020 Fiscal Year, Defendant Sloan received $375,445 in compensation from the Company, which was comprised entirely of stock awards.

90.     The 2021 Proxy Statement stated the following about Defendant Sloan:

***Harry Evans Sloan*** has served on our Board since April 2020 and serves as Vice Chairman of DraftKings. Mr. Sloan is a media investor, entrepreneur and studio executive. Since 2011, Mr. Sloan has co-founded seven special purpose acquisition companies with his partners, including Jeff Sagansky and Eli Baker, raising aggregate gross proceeds of over $4 billion. Mr. Sloan is the co-founder, Chief Executive Officer and Chairman of Soaring Eagle Acquisition Corp. (Nasdaq: SRNGU), which completed its $1.725 billion IPO in February 2021. Prior to Soaring Eagle, he served as Chief Executive Officer and Chairman of Flying Eagle Acquisition Corp., which raised $690,000,000 in its initial public offering in March 2020 and in December 2020 completed its initial business combination with Skillz Inc. (NYSE: SKLZ), a technology company that enables game developers to monetize their content through fun and fair multi-player competition. Mr. Sloan remains a director of Skillz Inc. Prior to Flying Eagle, Mr. Sloan was a founding investor of Diamond Eagle Acquisition Corp., which raised $400 million in its initial public offering in May 2019 and in April 2020 completed its initial business combination with DraftKings, Inc. (Nasdaq: DKNG), a digital sports entertainment and gaming company known for its industry-leading daily fantasy sports and mobile sports betting platforms, and SB Tech (Global) Limited, an international turnkey provider of cutting-edge sports betting and gaming technologies. Prior to Diamond Eagle, Mr. Sloan was a founding investor of Platinum Eagle, which raised $325,000,000 in its initial public offering in January 2018, completed its initial business combination in March 2019 with Target Logistics Management, LLC and RL Signor Holdings, LLC and changed its name to Target Hospitality Corp. (Nasdaq: TH). Target Hospitality is a vertically integrated specialty rental and hospitality services company. Prior to Platinum Eagle, Mr. Sloan was a founding investor of Double Eagle, which raised $500,000,000 in its initial public offering in September 2015. Double Eagle completed its business combination in November 2017, in which its wholly-owned subsidiary acquired 90% of the shares of Williams Scotsman. In the transaction, Double Eagle changed its name to

WillScot Corporation and subsequently to WillScot Mobile Mini Holdings Corp. (Nasdaq: WSC). WSC is a specialty rental services market leader providing modular space and portable storage solutions to diverse end markets across North America. From October 2005 to August 2009, Mr. Sloan served as Chairman and Chief Executive Officer of Metro-Goldwyn-Mayer, Inc., a motion picture, television, home entertainment, and theatrical production and distribution company, and thereafter continued as non-executive chairman until December 2010. Throughout his entrepreneurial career, Mr. Sloan was responsible for the creation or sponsorship of three successful public companies in the media and entertainment industries: Lions Gate Entertainment Corp., an independent motion picture and television production company, New World Entertainment Ltd., an independent motion picture and television production company, and SBS Broadcasting, S.A., a European broadcasting group, operating commercial television, premium pay channels, radio stations and related print businesses in Western and Central and Eastern Europe, which he founded in 1990. He has served on the board of ZeniMax Media Inc., an independent producer of interactive gaming and web content, since 1999. Mr. Sloan began his career as an entertainment lawyer with Sloan, Kuppin and Ament, a law firm he founded. He currently serves on the University of California, Los Angeles Anderson School of Management Board of Visitors, the Executive Board of the UCLA School of Theatre, Film and Television and the Harry and Florence Sloan Family Foundation. Mr. Sloan received his J.D. from Loyola Law School and his B.A. from the University of California, Los Angeles.

**Defendant Walden**

91.     Defendant Walden has been a director of DraftKings and a member of the Company's Compliance Committee since the Merger. According to the 2021 Proxy Statement, Defendant Walden beneficially owned 144,956 shares of the Company's Common Stock as of March 1, 2021. Given that the closing price per share of the Company's Common Stock on March 1, 2021 was $68.72, Defendant Walden owned approximately $10 million of Common Stock as of that date.

92.     For the 2020 Fiscal Year, Defendant Walden received $375,445 in compensation from the Company, which was comprised entirely of stock awards.

93.     The 2021 Proxy Statement stated the following about Defendant Walden:

***Marni M. Walden*** retired from Verizon Communications Inc. ("Verizon"), which provides wireless phone services, Internet access, global enterprise solutions and digital television services, in February 2018, where she most recently served as a Strategic Advisor from January 2018 to February 2018, and prior to that, served as President and Executive Vice President of Global Media and Telematics from March 2016 to January 2018, in which she built new revenue streams for Verizon and guided strategy for Verizon Media and the Connected Vehicle business, and as President and Executive Vice President of Product Innovation from May 2014 to March 2016, in which she led global strategy, venture and technology teams across

all lines of business for Verizon. During her tenure at Verizon, as the company's top-ranking female executive, Ms. Walden lead multiple acquisitions and integrations including Yahoo, AOL, Fleetmatics, Telogis, Altel and RCC. Ms. Walden served as a director at Old DK from October 2018 to April 2020 and has served on our Board since April 2020. Ms. Walden's prior experiences include working for other wireless service providers including AT&T Inc., McCaw Communications, LLC and General Cellular Corporation. In addition, she served as Chief Operating Officer, from January 2011 to May 2014, and separately as Chief Marketing Officer, from October 2010 to January 2011, of Verizon Wireless, Inc. (f/k/a Cellco Partnership), a wireless telecommunications carrier. Ms. Walden currently serves as a member of the board of directors of Globetouch Inc. d/b/a Airlinq Inc. (since February 2017), which develops & deploys large scale connected applications around smart mobility and ecosystem monetization; Persado Inc. (since June 2018), which uses artificial intelligence to generate language for digital marketing; and Loon LLC (since January 2019), which partners with mobile network operators globally to expand the reach of their LTE service. From April 2018 until July 2020, Ms. Walden served as a member of the board of directors of 4C Insights, Inc., which provides a self-service intelligence platform for marketers. She also serves as an advisor to Goldman Sachs and New Mountain Capital, as well as various private companies, including Transformco, Opensignal Limited. Inc, and Life Impact Solutions, Inc. d/b/a Mobilize Solutions. Ms. Walden attended California State University, Chico, where she majored in English and minored in Communications.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

94.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

95.     Each controlling shareholder, director, and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

96.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

97.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

98.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

99.    As the controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

100.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Nevada, and the United States, and pursuant to the Company's own Code;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above.

101.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

102.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

103.    Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

104.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

105.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

106.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

107.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of the Company during the Relevant Period was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

108.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

109.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

**THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

***DEAC's Code of Ethics***

110.    DEAC's Code of Ethics, filed with the SEC as an exhibit to the Company's registration statement in connection to DEAC's IPO, states that it "is applicable to all of the Company's directors, officers and employees."

111.    Under the heading "Honest, Ethical and Fair Conduct," the Code of Ethics provides that each person must, *inter alia*, "[o]bserve all applicable governmental laws, rules and regulations" and "[a]dhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices."

112.    Under the heading "Disclosure," the Code of Ethics provides that each person must:
- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

113.    Under the heading "Compliance," the Code of Ethics provides:

**It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations.** It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules and regulations, including those relating to accounting and auditing matters.

(Emphasis added.)

114.    Under the heading "Financial Statements and Other Records," the Code of Ethics provides:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. **Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.** Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

(Emphasis added.)

115.    In violation of the Code of Ethics' provisions concerning ethical conduct, disclosure, compliance and the accuracy of financial statements and other records, Defendants Sagansky, Baker, Delman, Kazam, Rosen, and Ross failed to perform effective due diligence in evaluating SBTech for purposes of the Merger, or consummated the Merger despite knowing of the Illicit Operations.

***DraftKings's Code***

116.    The Company's Code, adopted contemporaneously with the consummation of the Merger, states that "each of our directors, officers and other employees are bound by this Code of Business Ethics." It states:

Each person agrees that he or she will:
- Engage in honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Produce full, fair, accurate, timely and understandable disclosure in reports

34

and documents that we file with or submit to the Securities and Exchange Commission and in other public communications we make;

- **Comply with applicable governmental laws, rules and regulations**; and
- Promptly report any violations of this Code of Business Ethics to our Chief Legal Officer or Audit Committee.

(Emphasis added.)

117.    Under the heading "Honest and Ethical Conduct," the Code provides that each director, officer, and employee must "observe both the form and spirit of laws and governmental rules and regulations and accounting standards; and adhere to a high standard of business ethics."

118.    Under the heading "Disclosure," the Code provides:

Each director, officer or employee, to the extent involved in the Company's disclosure process, including without limitation the Senior Financial Officers, must:

- familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company; and
- **not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.**

(Emphasis added.)

119.    Under the heading "Compliance," the Code provides:

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, **including those relating to accounting and auditing matters and insider trading.**

**Generally, it is against Company policy for any individual to profit from undisclosed information relating to the Company or any other company in violation of insider trading or other laws. Anyone who is aware of material nonpublic information relating to the Company, our customers, or other companies may not use the information to purchase or sell securities in violation of the federal securities laws.**

(Emphasis added.)

120.    In violation of the Code's provisions concerning honest and ethical conduct, disclosure, and compliance, the Company's directors allowed SBTech to continue to engage in the Illicit Operations through its relationship with BTi/CoreTech, and they failed to disclose the failure of the Company's compliance policies and resulting unlawful conduct to the Company's

shareholders and the investing public.

***DraftKings' Compliance Committee Charter***

121.   The Company's Compliance Committee Charter, adopted contemporaneously with the consummation of the Merger, provides:

> The Committee, to the extent the Board deems necessary or appropriate, shall have the full power and authority to carry out the following primary responsibilities or to delegate such power and authority to one or more subcommittees of the Committee:
>
> 1. Laws and Regulations Review. Identify, review and analyze non-financial laws and regulations applicable to the Corporation and its business, and identify, review and analyze risk factors with regard to such laws and regulations that may impact the Corporation or its business. The Committee shall also have the primary responsibility of reviewing, evaluating and recommending actions, policies or procedures to the Board that will help the Corporation remain in compliance with such laws and regulations. The Committee shall also have the primary responsibility of reviewing and evaluating the Corporation's current and prospective compliance efforts.
>
> 2. *Compliance Programs and Monitoring*. Monitor the Corporation's efforts to implement compliance programs, policies and procedures that comply with local, state and federal laws, regulations and guidelines, respond to various compliance and regulatory risks facing the Corporation and support lawful and ethical business conduct by the Corporation's employees.
>
> 3. Risk Area Review. Review significant non-financial compliance risk areas, as identified by management, and the steps management has taken to monitor, control and report such compliance risk areas.
>
> 4. *Program Assessment*. Discuss with management on a periodic basis the adequacy and effectiveness of the Corporation's policies and procedures to assess, monitor, and manage non-financial compliance business risk, and legal, ethical and regulatory compliance programs (the "*Programs*").
>
> 5. *Programs Assessment*. Monitor compliance with the Programs, authorize waivers of the Programs in accordance with the terms thereof, investigate any alleged breach or violation of the Programs, enforce the provisions of the Programs and review the Programs periodically and recommend changes, if any, to the Board for approval.
>
> 6. *Noncompliance Investigation*. Oversee the investigation of, and request the investigation of, any significant instances of noncompliance with laws or the Corporation's compliance programs, policies or procedures, or potential compliance violations that are reported to the Committee.
>
> 7. *Procedure Review*. Review the Corporation's procedures for the receipt, retention and treatment of complaints received by the Corporation regarding non-financial compliance matters and for the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable non-financial compliance matters.

8. *Reporting to the Board.* The Committee, through the Chairperson, shall report at least annually to the Board, on the Committee's activities, findings and recommendations, including the results of any evaluations.

9. *Charter Review.* Review the Committee's Charter from time to time and recommend any proposed changes to the Board.

10. *Additional Duties.* Perform any other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

(Emphasis added.)

122.     In violation of the Compliance Committee Charter, the Compliance Committee failed to ensure that the Company's SBTech subsidiary was acting in compliance with applicable laws, and instead allowed SBTech to continue engaging in the Illicit Operations, particularly through its "distributor" entity BTi/CoreTech. To the extent the Board did not deem it "necessary or appropriate" to grant the Compliance Committee full exercise of the powers enumerated in the Compliance Committee Charter, the violations of the Compliance Committee Charter alleged herein are attributable to the Board, as well.

### *DraftKings' Audit Committee Charter*

123.     The Company's Audit Committee Charter, adopted contemporaneously with the Merger, tasks the Audit Committee with:

assist[ing] the Board of Directors in its oversight of: (1) the integrity of the financial statements of the Corporation, (2) the independent auditor's qualifications and independence, (3) the performance of the Corporation's internal audit function and independent auditors, and (4) ***the compliance by the Corporation with legal and regulatory requirements*** not specifically delegated to the Compliance Committee or the Nominating and Corporate Governance Committee.

(Emphasis added.)

124.     The Audit Committee Charter requires that the Audit Committee oversee significant financial reporting issues and internal audit controls and procedures. It provides:

The Audit Committee shall have the duty and power to advise management, the internal auditing department and the independent auditors that they are expected to provide to the Audit Committee a timely analysis of significant financial reporting issues and practices and significant internal audit controls and procedures.

125.     Among other things, the Audit Committee Charter tasks the Audit Committee with discussing with independent auditors and management: (1) "the quality of the financial statements," (2) "the clarity and adequacy of the Corporation's financial disclosures," (3) "the adequacy of the Corporation's system of internal accounting controls," and (4) "the performance

of the independent auditors."

126.    The Audit Committee Charter requires the Audit Committee to closely review quarterly and annual reports. It provides:

> The Audit Committee shall review any other financial statements or reports, as requested by management or determined by the Audit Committee, which are required to be filed with any Federal, State or local regulatory agency prior to filing with the appropriate regulatory body. As a part of such review, the following illustrates, but is not an exhaustive list of, the topics which may be covered:
>
> (a)    the accounting principles employed in reporting any large or unusual transactions and the possible need to make specific disclosures of material developments,
>
> (b)    developments in accounting policies and procedures since the previous filing of such financial statement or report and the effect of these developments may have on the Corporation's financial reporting, and
>
> (c)    significant fluctuations in financial statement balances, ratios or statistics.

127.    The Audit Committee Charter also requires that the Audit Committee perform the following functions:

> (a) conduct or authorize investigations into any matters within the Audit Committee's scope of responsibilities. The Audit Committee shall be empowered to retain independent counsel and other professionals to assist in the conduct of any investigation in consultation with the Chief Legal Officer of the Corporation;
> (b) review legal and regulatory matters that may have a material impact on the financial statements, related company compliance policies, and programs and reports received from regulators;
> (c) establish procedures for the (i) receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters;
> (d) discuss the Corporation's policies with respect to risk assessment and risk management, and review contingent liabilities and risks that may be material to the Corporation;
> (e) prepare a report each year for inclusion in the Corporation's proxy statement;
> (f) review and discuss earnings press releases prior to public disclosure; and
> (g) review, approve, ratify or rescind related person transactions pursuant to the Corporation's Related Person Transactions Policy.
> (Emphasis added.)

128.    In violation of the Audit Committee Charter, the Audit Committee failed to conduct oversight of the Company's financial statements, the performance of the Company's internal audit function and independent auditors, and the Company's compliance with legal and regulatory

requirements. As a result, the Company continued to engage in the Illicit Operations.

129.    The Individual Defendants violated the Code of Ethics, the Code, the Compliance Committee Charter, and the Audit Committee Charter by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, seven of the Individual Defendants violated the Code by selling Company shares at inflated prices for aggregate proceeds in excess of $825 million. Further in violation of the Code and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

130.    DraftKings is a Nevada corporation based in Boston, Massachusetts that operates as a digital sports entertainment and gaming company. It provides fantasy sports, sports betting, and online casino opportunities, and is also involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sports betting and casino gaming products.

131.    SBTech is a wholly owned subsidiary of DraftKings with a long and ongoing record of operating in grey and black markets, particularly as related to its affiliated "distributor" or "reseller" entity BTi/CoreTech.

132.    In breach of their fiduciary duties, the Individual Defendants caused DEAC and Old DK to merge with SBTech, exposing those companies and DraftKings to the Illicit Operations.

133.    In further breach of their fiduciary duties , the Individual Defendants made or caused the Company to make materially false and/or misleading statements that failed to disclose the Illicit Operations and the inadequacy of the Company's internal controls.

### SBTech's Unlawful Operations in Asia

134.     During the Relevant Period, the Individual Defendants caused DEAC and Old DK to merge with SBTech, which has a long and ongoing record of operating in black markets. The Illicit Operations continued throughout Relevant Period, as evidenced by the Company's significant revenues from "resellers" in Asia that use SBTech operations and technology in jurisdictions where laws restrict online gambling operations and technology.

135.     Various jurisdictions around the world prohibit some or all forms of gambling, posing significant compliance risks for companies operating in the online gaming industry. For instance, Vietnam, Indonesia, and China have taken a strong stance against online gambling.[6]

136.     Nonetheless, from at least 2014 until 2017, SBTech was advertising that it accepted Vietnamese Dong and Indonesian Rupees,[7] suggesting that SBTech was operating in those jurisdictions. In fact, SBTech's Vice President of Business Development Tom Light a/k/a Tom John Or-Paz ("Light") touted SBTech's Asian platform at a 2015 conference, stating that it was "very rooted in Asia."

137.     A few months after the United States Supreme Court heard arguments in December 2017 in the case of *Murphy v. National Collegiate Athletic Association*, where the Court considered the constitutionality of a federal statute prohibiting state authorization of sports gambling schemes, SBTech announced that Light was departing SBTech to create a "new blockchain and gambling venture." Just days after Light's departure from SBTech, a Maltese company was registered with the name of Lucky Tech Limited, registration number C 85475.[8] Light had 100% beneficial ownership of the company.[9] Lucky Tech Limited would later incorporate a limited liability company called BTI Bulgaria ("BTi").[10] After the Supreme Court

---

[6] https://www.onlinebetting.com/legal/vietnam/ (Vietnam) (last visited August 20, 2021); https://www.gambling.com/country-overviews/indonesia (Indonesia) (last visited August 20, 2021); https://www.casino.org/news/china-online-gambling-crackdown-over-11500-arrests-since-february (China) (last visited August 21, 2021).
[7] https://web.archive.org/web/20150925061832/http:/www.sbtech.com/solutions-asian-agent-networks.html (last visited August 30, 2021).
[8] https://www.slideshare.net/secret/EYOnD1FDw5bbyI (last visited August 21, 2021).
[9] https://www.slideshare.net/secret/JAXhfszIbn2ccQ (last visited August 21, 2021).
[10] https://www.slideshare.net/secret/qB1jKpl7bURaMU (last visited August 21, 2021).

determined that the federal statute prohibiting state authorization of sports gambling schemes was unconstitutional, paving the way for a renaissance in online gaming in the United States,[11] BTi offered a route for SBTech to reach grey and black markets while ostensibly maintaining a legal veil between SBTech and BTi.

138.   According to a Form S-4 filed by DEAC NV Merger Corp. on January 6, 2020, Defendant Sloan of DEAC, Defendant Robins of Old DK, and Defendant Meckenzie of SBTech met on June 15, 2019 to discuss the eventual Merger of their respective companies. Only two days after the meeting took place, BTi changed its name to CoreTech Bulgaria ("CoreTech"), an apparent effort to further mask BTi's relationship to SBTech.[12]

139.   However, SBTech's and BTi/CoreTech's efforts to separate were ineffective, as even employees failed to understand the distinction between the entities. At least one employee claims to have worked at both BTi/CoreTech and SBTech simultaneously.[13] Another lists employment experience from April 2018 onward as a Senior Backend Developer (Customer Success) at "BTi Group – A SBTech Company."[14]

140.   The lack of separation between SBTech and BTi/CoreTech implicates the Company in unlawful activity as, according to interviews of former BTi/CoreTech employees conducted by Hindenburg, "almost all" or "[w]ell over 90%" of BTi/Coretech's business comes from black or grey markets.

141.   For instance, according to Hindenburg's investigation, BTi's technology has been linked to various black-market operators and to suspected organized crime, including in Thailand, Vietnam, and China.[15]

142.   Moreover, at least one American regulator has discovered that SBTech may have operated in a black-market jurisdiction. According to a report generated in connection with an

---

[11] *See Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461 (2018).
[12] https://www.slideshare.net/secret/4VcMiUuDtPA4Nr (last visited August 21, 2021).
[13] https://www.linkedin.com/in/valentina-lesova-1a884411a/ (listing employment history for both SBTech and BTI from July 2018 until November 2018) (last visited August 20, 2021).
[14] https://www.cakeresume.com/robert-v-huang?locale=ja (last visited August 20, 2021).
[15] https://hindenburgresearch.com/draftkings/ (last visited August 21, 2021)

investigation by the Oregon Lottery into SBTech's operations,

> **SBTech may have conducted business in Iran, a country considered to be a black-market jurisdiction.** Further investigation revealed that in the early Spring of 2018, SBTech became aware one of SBTech's contracted B2B distributors accepted wagers from one of the said distributor's end use operators in Iran. When SBTech learned of the end use operator's violations SBTech took immediate action and caused the distributor to terminate business with the end use operator.[16]

(Emphasis added.)

143.   The Oregon Lottery report also stated that one of SBTech's competitors "has alleged SBTech generates revenue through *affiliated operators* in China, a jurisdiction where gambling laws and enforcement are unclear."[17] (Emphasis added.)

144.   Despite the foregoing evidence of SBTech's and BTi/CoreTech's long and ongoing record of operating in black markets, the Company has not identified its "resellers," nor has it disclosed its relationship with BTi/CoreTech, in SEC filings or otherwise. The inescapable conclusion is that SBTech and BTi/CoreTech remain closely linked, and that BTi/CoreTech traffics SBTech technology in grey or black markets throughout Asia.

145.   Indeed, SBTech has disclosed that it relies heavily on unidentified "resellers" to profit from markets in Asia. For instance, in a prospectus filed on April 27, 2020, the Company disclosed that nearly half of SBTech's revenue for the year ended December 31, 2019 came from a single reseller:

> SBT offers their services directly to operators in Europe and uses a reseller model in Asia. SBT's financial performance depends on the underlying financial performance of its direct operators and its resellers. *In particular, SBT relies primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019.* An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on SBT's or New DraftKings' business.

(Emphasis added.)

146.   For the following year, the portion of SBTech's revenue coming from this single

---

[16] https://www.slideshare.net/secret/FXIV0jPL7V6Fsq (last visited August 30, 2021)
[17] *Id.*

reseller had actually increased, now comprising more than half of SBTech's revenue:

> SBT [SBTech] historically offered its services directly to operators in Europe and through a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. For example, ***SBT relied primarily on one reseller for approximately 52% of SBT's revenue in the year ended December 31, 2020*** (excludes SBT activity that occurred prior to the Business Combination on April 23, 2020). An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

(Emphasis added.)

147.    Despite the close relationship between BTi/CoreTech and SBTech, the Company has not disclosed whether BTi/CoreTech is the reseller that accounted for 52% of SBTech's revenue in the year ended December 31, 2020 and 46% of SBTech's revenue in the year ended December 31, 2019. However, according to interviews by Hindenburg Research, a former employee who worked for both SBTech and BTi/CoreTech contended that BTi/CoreTech relied exclusively on SBTech technology, stating, "[a]ll CoreTech business comes from SBT[ech]."

**False and Misleading Statements Made During the Relevant Period**

***December 23, 2019 Press Release and Form 8-Ks with Exhibits***

148.    On December 23, 2019, Old DK issued a press release announcing the Merger. The press release was also appended as an exhibit to one of two Form 8-Ks filed by DEAC the same day. The press release stated the following regarding SBTech:

**SBTech Highlights**
- SBTech is a premier global full-service B2B turnkey technology provider with omni-channel sports betting solutions, trading services, and marketing and bonus tools powering some of the world's most popular sports betting and online gaming brands.
- 50+ partners in 20+ regulated markets and jurisdictions including Czech Republic, Denmark, Ireland, Italy, Mexico, Portugal, Spain, Sweden, and U.K. and Arkansas, Indiana, Mississippi, New Jersey, Oregon and Pennsylvania in United States.
- Awarded exclusive contract offering mobile and retail sports betting for the Oregon state lottery with their Oregon Lottery Scoreboard brand.

"The combination of DraftKings and SBTech brings together two tech-native companies with the customer at their cores," said Gavin Isaacs, SBTech's Chairman. "SBTech will maintain its core business and continue its B2B focus. We are excited about the opportunity to join a company with a similar innovation DNA and create a unique and differentiated player in global sports betting and online gaming."

43

149.    In another exhibit appended to the same Form 8-K DEAC attached an investor presentation that described SBTech as: (1) "the world leader in online gaming technology," (2) an "[i]ndustry leader in **B2B sports betting technology**," (3) "[p]ositioned as one of the fastest growing tech firms within sports betting, with an **omni-channel solution**," (4) having a "**[p]roven track record of outperformance** vs. industry peers on growth and margin," and (5) having a "**[g]rowing global footprint** with material new opportunities emerging in Europe, U.S., Africa, Latin America, and Asia."

150.    In the second Form 8-K DEAC filed that day, DEAC attached a transcript of a Company conference call in which the Merger was discussed. In the transcript, Defendant Robins stated as a "key investment point" "the combination with SBTech, who is the leading B2B [business-to-business] innovator in sports technology, powering some of the world's most popular sports betting and online gaming brands, creates a unique, vertically integrated, customer focused U.S. market opportunity." He also made the following comments regarding SBTech:

> Layering in SBTech, the industry leader in B2B sport's technology, strengthens us and creates a unique, vertically integrated company in the category. SBTech is one of the fastest growing tech firms within sports betting, featuring an omnichannel solution. They have a proven track record of outperformance versus industry peers on both growth and margin. ***The company has a global footprint with material new opportunities emerging in the U.S., Europe, Africa, Latin America, and Asia.***
>
> Together we will benefit in several ways as we bring DraftKings and SBTech together, including: investing in the user experience, introducing more unique pre-game, in-game and parlay type bets; setting odds more effectively by leveraging our risk management tools; diversifying our business model as we combine B2B and B2C revenues; bringing outsourced technology in-house, creating very strong financial synergies.

(Emphasis added.)

***January 13, 2020 Form 8-K with Exhibit***

151.    On January 13, 2020, DEAC filed a Form 8-K with the SEC and attached another investor presentation as an exhibit. The investor presentation materials described SBTech as: (1) "a leader in online gaming technology," (2) "[p]ositioned as one of the fastest growing tech firms within sports betting, with an **omni-channel solution**," (3) having a "**[p]roven track record of outperformance** vs. industry peers on growth and margin," and (4) having a "**[g]rowing global**

**footprint** with material new opportunities emerging in Europe, U.S., Africa, Latin America, and Asia."

152.    The statements referenced in ¶¶148–51 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that SBTech's "growing global footprint" included engaging in the Illicit Operations.

### March 5, 2020 Form 8-K with Exhibit

153.    On March 5, 2020, the Company filed a Form 8-K with the SEC. The Form 8-K included as an exhibit the transcript of an interview of Defendant Robins conducted on March 3, 2020 by an analyst from Morgan Stanley. In the interview, Defendant Robins stated:

> I think for us there were really three objectives that we were trying to solve for.  And the way we approach anything at the company, including something like how do we capitalize the business, what's the best financing route, is we start with what are we trying to accomplish and then what is the most effective way to accomplish that.  Seems simple enough.

> So the three things we were trying to accomplish were we had identified this company, SBTech, which we felt was a really important part of the full product that we needed to build out and we thought this was a great opportunity to really add the one piece we thought we were missing on the technology and product side.

154.    The statements referenced in ¶153 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendant Robins failed to disclose, *inter alia*, that building out Old DK by merging with SBTech would expose Old DK to SBTech's history of engaging in the Illicit Operations.

### March 12, 2020 Press Release

155.    The Company issued a press release on March 12, 2020, in which Defendant Robins was quoted as stating the following:

> "This was a transformative year for DraftKings. We further established ourselves as a leader in the rapidly evolving digital sports and gaming industry, launched products in six new states and announced a business combination with Diamond Eagle and SBTech to become a public company," said Jason Robins, co-founder and Chief Executive Officer of DraftKings. "I am excited to have closed out 2019, having achieved net revenue of $323M for the full year, a 43% increase over 2018."

156.    The press release also included the following statement:

Upon close of the business combination, DraftKings will become the only vertically-integrated pure-play sports betting and online gaming company based in the United States. Through the business combination, DraftKings expects to realize synergies by transitioning its risk and trading sports betting platform to SBTech's, instead of relying on a third-party platform. In addition to reducing costs, DraftKings will control its backend system and product roadmap, differentiating the company from other U.S. operators and giving it the ability to tailor its sports betting product to U.S. sports and users.

***April 15, 2020 Proxy Statement***

157.    On April 15, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Sagansky, Delman, Kazam, Rosen, and Ross solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[18]

158.    The 2020 Proxy Statement called for Company shareholders to approve the business combination agreement that led to the Merger, following which Defendants Robins, Isaacs, Kalish, Levin, Liberman, Meckenzie, R. Moore, Murray, Nada, Rosenblatt, Slater, Sloan, and Walden were nominated and elected to the Board.

159.    In a section disclosing risk factors relating to the Merger and integration of Old DK's and SBTech's businesses, the 2020 Proxy Statement stated the following:

> ***We may incur successor liabilities due to conduct arising prior to the completion of the Business Combination.***
> New DraftKings may be subject to certain liabilities of DraftKings and SBT. DraftKings and SBT at times may each become subject to litigation claims in the operation of its business, including, but not limited to, with respect to employee matters and contract matters. From time to time, DraftKings and SBT may also face intellectual property infringement, misappropriation, or invalidity/non-infringement claims from third parties, and some of these claims may lead to litigation. DraftKings and SBT may initiate claims to assert or defend their own intellectual property against third parties. Any litigation may be expensive and time-consuming and could divert management's attention from its business and negatively affect its operating results or financial condition. The outcome of any

---

[18] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

litigation cannot be guaranteed and adverse outcomes can affect New DraftKings, DraftKings and SBT negatively.

DraftKings and SBT may also face inquiry and investigation by governmental authorities, which could in turn lead to fines, as the regulatory landscape of sport betting and iGaming changes.

160.    The 2020 Proxy Statement also disclosed the following risk factor related to obtaining licenses in diverse jurisdictions:

SBT's and DraftKings' licenses and applications for licenses in certain jurisdictions may be subject to a review procedure or an ownership change consent requirement by regulators as a result of the Business Combination (including following its consummation), which could result in a license or application being delayed, canceled, withheld, or subjected to additional requirements or conditions.

Both SBT and DraftKings hold certain licenses and have filed certain applications for licenses to operate iGaming and sports-betting products in various jurisdictions. The regulatory bodies that oversee and issue these licenses and review such applications regularly review corporate transactions involving ownership changes to determine whether the ownership changes have any impact on current licenses held by, or applications pending with respect to, either company. Such regulatory bodies also have broad discretion in determining whether to deny applications, cancel existing licenses, withhold new licenses or require the businesses to comply with additional conditions as a result of a business combination. We cannot assure you that we will be able to obtain regulatory review of our applications or licenses in a timely fashion or without any limitations as a result of the Business Combination.

161.    Further, the 2020 Proxy Statement disclosed a risk factor related to SBTech's involvement in a business-to-business model in international jurisdictions:

**SBT's business includes a B2B business model, primarily in international jurisdictions, which business depends on the underlying financial performance of its direct operators and its resellers. As a material part of SBT's revenue is currently generated through resellers and direct sales to operators, a decline in such resellers' or direct operators' financial performance or a termination of some or all of the agreements with such resellers or operators could have a material adverse effect on SBT's or New DraftKings' business.**

SBT offers their services directly to operators in Europe and uses a reseller model in Asia. SBT's financial performance depends on the underlying financial performance of its direct operators and its resellers. In particular, SBT relies primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on SBT's or New DraftKings' business.

162.     The 2020 Proxy Statement also disclosed as a risk factor that the Company could face delays in licensing following the Merger:

> ***Given the increased number of jurisdictions in which we will operate after the Business Combination, we may experience delays in the licensing application and approval process, depending on the regulatory requirements in each relevant jurisdiction.***
>
> Regulated gaming license applications frequently involve an in-depth suitability review of the applicant's business and associated individuals including certain officers, directors, key employees and significant shareholders. These applications take substantial time to prepare and submit, often requiring the production of multiple years' worth of business and personal financial records and disclosures which take considerable time to compile, followed by the regulator's investigatory process which may take months or even years to complete. Due to the increased number of jurisdictions in which we will operate after the Business Combination, as well as additional jurisdictions which may pass laws authorizing and requiring licensure to operate sports betting, iGaming or daily fantasy sports, we may experience delays in the licensing application and approval process due to the volume of application materials we must prepare and submit and the number of jurisdictions for which information is required. Many jurisdictions in which we are already licensed will require additional applications and disclosures as a result of the Business Combination which may also contribute to delays in the licensing application and approval process in additional jurisdictions.

163.     Finally, the 2020 Proxy Statement disclosed that SBTech's substantial international operations were likely to expose the Company to risks associated with foreign currency transaction and translation:

> ***SBT's business, which includes significant international operations, is likely to expose New DraftKings to foreign currency transaction and translation risks. As a result, changes in the valuation of the U.S. dollar in relation to other currencies could have positive or negative effects on New DraftKings' profit and financial position.***
>
> SBT's global operations are likely to expose New DraftKings to foreign currency transaction and translation risks. Currency transaction risk occurs in conjunction with purchases and sales of products and services that are made in currencies other than the local currency of the subsidiary involved, for example if the parent company pays, or transfers U.S. dollars to a subsidiary in order to fund its expenses in local currencies. Currency translation risks occurs when the income statement and balance sheet of a foreign subsidiary is converted into currencies other than the local currency of the company involved, for example when the results of these subsidiaries are consolidated in the results of a parent company with a different reporting currency. As a result, SBT has historically been, and New DraftKings is expected to be, exposed to adverse movements in foreign currency exchange rates, which may adversely impact New DraftKings' financial positions and results of operations.

> Due to SBT's global presence, a significant majority of its revenues, operating expenses and assets and liabilities are non-U.S. dollar denominated and therefore subject to foreign currency fluctuation once consolidated in New DraftKings, whose functional currency is expected to be the U.S. dollar. New DraftKings will face exposure to currency exchange rates as a result of the growth in its non-U.S. dollar denominated operating expense across Europe. For example, an increase in the value of non-U.S. dollar currencies against the U.S. dollar could increase costs for delivery of products, services and also increase cost of local operating expenses and procurement of materials or services that New DraftKings must purchase in foreign currencies by increasing labor and other costs that are denominated in such local currencies. These risks related to exchange rate fluctuations may increase in future periods as New DraftKings' operations outside of the United States expand.

164.    The 2020 Proxy Statement was materially misleading because, while acknowledging SBTech's significant international operations, it failed to disclose that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company following the Merger; (4) DEAC's officers and directors failed to perform effectual due diligence in evaluating SBTech for purposes of the Merger, or consummated the Merger despite knowing of the Illicit Operations; and (5) DEAC failed to maintain adequate internal controls.

165.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders approved the Merger, consequently exposing the Company and its subsidiaries to SBTech's long and ongoing record of engaging in the Illicit Operations.

***April 23, 2020 Press Release***

166.    The Company issued a press release on April 23, 2020 announcing the consummation of the Merger. The press release included the following statement from Defendant Robins:

> "Today marks another milestone for DraftKings and the future of digital sports entertainment and gaming in America," said Jason Robins, co-founder and CEO of DraftKings. "By bringing together our leading consumer brand, data science expertise and industry-leading products with SBTech's proven technology platform, we will accelerate our innovation, growth and scale. I am confident that the new DraftKings will progress our goal of offering the best, most innovative sports and gaming products to our customers."

167.    The statements referenced in ¶166 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the Merger had exposed Old DK and DEAC to extensive dealings in black-market gaming, money laundering, and organized crime.

***April 27, 2020 Prospectus***

168.    In a prospectus filed with the SEC on April 27, 2020 (the "April 27, 2020 Prospectus"), the Company stated:

> Following the consummation of the Business Combination with SBTech, we also plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto SBTech's proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage the combined entity's shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. SBTech offers one of the industry's most robust platform solutions to satisfy its customers' sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. SBTech competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, SBTech offers a leading iGaming solution via its proprietary platform with integrations to third-party iGaming suppliers.

169.    The April 27, 2020 Prospectus stated that "DraftKings has been built on the foundation of four core principles," including the following:

> ***Act responsibly***. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining when a user may need assistance. With our focus on fair and responsible gaming along with user protection and data security, users have come to know and trust our gaming platform.

170.    Additionally, the Company included the following statement in the April 27, 2020 Prospectus regarding domestic and international compliance:

50

SBTech has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, SBTech has certified its software in Denmark, Italy, Nigeria, Portugal and Spain, and its platform and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Sweden under local licenses held by operators using SBTech's platform in these jurisdictions.

Underpinning our regulatory access is our DraftKings platform that allows us to efficiently and safely scale our product offerings into multiple jurisdictions. We have developed our DraftKings platform from the ground up to meet the needs of the unique regulatory environment that the United States offers, while maintaining ease of use for our users. We provide a single experience for login, verification and wallet.

SBTech's platform has been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on user behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

171.    The April 27, 2020 Prospectus also included the following statement describing the heavy reliance of SBTech on a single unnamed reseller:

SBT offers their services directly to operators in Europe and uses a reseller model in Asia. SBT's financial performance depends on the underlying financial performance of its direct operators and its resellers. In particular, SBT relies primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on SBT's or New DraftKings' business.

***May 13, 2020 Prospectus***

172.    In a prospectus filed with the SEC on May 13, 2020 (the "May 13, 2020 Prospectus"), the Company stated:

We plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto SBTech's proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage our shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. SBTech offers one of the

industry's most robust platform solutions to satisfy its customers' sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. SBTech competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, SBTech offers a leading iGaming solution via its proprietary platform with integrations to third-party iGaming suppliers.

173.    The May 13, 2020 Prospectus stated that "DraftKings has been built on the foundation of four core principles," including the following:

> **Act responsibly**. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining when a user may need assistance. With our focus on fair and responsible gaming along with user protection and data security, users have come to know and trust our gaming platform.

174.    Additionally, the Company included the following statement in the May 13, 2020 Prospectus regarding domestic and international compliance:

> SBTech has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, SBTech has certified its software in Denmark, Italy, Nigeria, Portugal and Spain, and its platform and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Sweden under local licenses held by operators using SBTech's platform in these jurisdictions.

> Underpinning our regulatory access is our DraftKings platform that allows us to efficiently and safely scale our product offerings into multiple jurisdictions. We have developed our DraftKings platform from the ground up to meet the needs of the unique regulatory environment that the United States offers, while maintaining ease of use for our users. We provide a single experience for login, verification and wallet.

> SBTech's platform has been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on user behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

175.    The May 13, 2020 Prospectus also included the following statement describing the heavy reliance of SBTech on a single unnamed reseller:

SBT historically offered its services directly to operators in Europe and uses a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. In particular, SBT relied primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

176.    The statements referenced in ¶168–75 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the Company had acted irresponsibly in combining with SBTech, given SBTech's long and ongoing record of operating in black markets.

**May 15, 2020 Press Release and Earnings Call**

177.    On May 15, 2020, the Company issued a press release in conjunction with the filing of its quarterly report on Form 10-Q for the first quarter of 2020. The press release stated as follows:

Through its recent business combination, DraftKings has created the only vertically integrated sports betting company based in the United States.

"We are uniquely positioned at the intersection of digital sports entertainment and gaming in a rapidly growing industry," said Jason Robins, DraftKings co-founder, CEO and Chairman of the Board. "DraftKings recorded standalone Q1 year-over-year revenue growth of 30% despite the effects of COVID-19. Additionally, the engagement we continue to see from our customers validates the connection they have with our content, their passion for our products and most importantly their loyalty to our brand."

178.    The Company also held a conference call that day to discuss the Company's quarterly financial results. In the call, Defendant Robins stated that, "[t]hrough the acquisition of SBTech, we have created the only vertically integrated sports betting company in the U.S., enabling us to be the product innovation leader for American sports, with a clear focus on the American sports fan."

179.    Also during the call, Defendant Park stated as follows:

Starting with Old DraftKings, despite COVID we generated $89 million of net revenue in the quarter, which is an increase of 30% versus prior year. Notably pre-

53

COVID prior to March 11, our revenue was up 60% versus prior year. These results are due to our strategy of launching in new states, as well as growing revenue in existing states. In this quarter, we were live in five new states for online sports betting, versus the first quarter of 2019, Indiana, Iowa, New Hampshire, Pennsylvania, and West Virginia.

180.    Defendant Park continued:

Now turning to SBTech. Old SBTech revenue generated €22.6 million, an increase of 3% versus Q1 2019. Notably, pre-COVID, prior to March 11, our revenue was up 19% versus prior year.

Adjusted EBITDA was negative €851,000 versus prior year of positive €4.3 million. SBTech was well on track to achieve positive EBITDA for the quarter, until COVID hit. And we anticipate to return to profitability once the major sports resume.

181.    The statements referenced in ¶177–80 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that SBTech's revenue came, in significant part, from a "front" entity and other resellers that operated in grey and black markets.

### June 22, 2020 Prospectus

182.    In a prospectus filed with the SEC on June 22, 2020 (the "June 22, 2020 Prospectus"), the Company stated:

We plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto SBTech's proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage our shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. SBTech offers one of the industry's most robust platform solutions to satisfy its customers' sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. SBTech competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, SBTech offers a leading iGaming solution via its proprietary platform with integrations to third-party iGaming suppliers.

183.    The June 22, 2020 Prospectus stated that "DraftKings has been built on the foundation of four core principles," including the following:

***Act responsibly***. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining when a user may need assistance. With our focus on fair and responsible gaming along with user protection and data security, users have come to know and trust our gaming platform.

184.    Additionally, the Company included the following statement in the June 22, 2020 Prospectus regarding domestic and international compliance:

SBTech has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, SBTech has certified its software in Denmark, Italy, Nigeria, Portugal and Spain, and its platform and sportsbook are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Sweden under local licenses held by operators using SBTech's platform in these jurisdictions.

Underpinning our regulatory access is our DraftKings platform that allows us to efficiently and safely scale our product offerings into multiple jurisdictions. We have developed our DraftKings platform from the ground up to meet the needs of the unique regulatory environment that the United States offers, while maintaining ease of use for our users. We provide a single experience for login, verification and wallet.

SBTech's platform has been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on user behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

185.    The June 22, 2020 Prospectus also included the following statement describing the heavy reliance of SBTech on a single unnamed reseller:

SBT historically offered its services directly to operators in Europe and uses a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. In particular, SBT relied primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

55

186.    The statements referenced in ¶182–85 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the Company was not acting responsibly and was instead continuing to engage in the Illicit Operations.

***August 14, 2020 Press Release and Earnings Call***

187.    On August 14, 2020 the Company announced financial results for the second quarter of 2020. In a press release issued in conjunction with the announcement, the Company stated:

> DraftKings Inc. . . . today reported financial results for the second quarter of 2020. For the three months ended June 30, 2020, DraftKings reported GAAP revenue of $71 million compared to $57 million during the same period in 2019. On a pro forma basis, including the effect of the Company's business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp. as if it had been completed on January 1, 2019, revenue would have been $75 million in the second quarter of 2020, compared to $83 million during the same period in 2019. DraftKings ended the second quarter of 2020 with over $1.2 billion in cash and no debt on its balance sheet.

> "We believe that the best product will ultimately win with the American consumer," said Jason Robins, DraftKings Co-Founder, CEO and Chairman of the Board. "As a technology first organization, we will continue to focus on bringing new and innovative products to market that strengthen our engagement with customers and maintain our competitive differentiation."

188.    The Company also held a conference call that day to discuss the Company's quarterly financial results. In the call, Defendant Robins stated as follows:

> We had a strong second quarter, given the limited sports calendar, with second quarter pro forma revenue of $75 million. As sports have started to return, we saw revenue improve sequentially each month in the quarter, with June revenue increasing 20% year-over-year on a proforma basis. The strong overall results and improvement are due to our product innovation, our entry into new jurisdictions and pent-up demand for sports betting as live sports like golf, European soccer and NASCAR and UFC started to return.

***October 8, 2020 Prospectus***

189.    In a prospectus filed with the SEC on October 8, 2020 (the "October 8, 2020 Prospectus"), the Company stated:

We plan to expand our offerings to begin serving other operators within our industry. We will begin by migrating DraftKings' own consumer offering onto the SBTech proprietary sports betting platform over time, allowing us to become a fully vertically integrated sports betting operator. We will also leverage our shared infrastructure to service adjacent branded operators in both the United States and internationally at greater scale. This could include online sportsbooks, retail sportsbooks, iGaming operators, as well as governments or lotteries seeking to manage their own sportsbook or iGaming offerings. Our SBTech platform offers one of the industry's most robust platform solutions to satisfy customers' sports betting technology needs, ranging from trading and risk management to platform services to support reporting, customer management and regulatory reporting requirements. Our B2B business competes with a variety of other sports betting technology providers and differentiates itself through this full suite platform offering. In addition, we are able to offer through SBTech, a leading iGaming solution via a proprietary platform with integrations to third-party iGaming suppliers.

190.     The October 8, 2020 Prospectus stated that "DraftKings has been built on the foundation of four core principles," including the following:

> ***Act responsibly***. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. We have invested in processes that identify and protect vulnerable users. Specifically, we created an internal, independent "Game Integrity and Ethics Team" that actively monitors for any indication of activities that may violate current regulations governing us, our own terms of use or our "Community Guidelines." This team oversees a framework for our user community to follow in determining when a user may need assistance. With our focus on fair and responsible gaming along with user protection and data security, users have come to know and trust our gaming platform.

191.     Additionally, the Company included the following statement in the October 8, 2020 Prospectus regarding domestic and international compliance:

> Our B2B business, formerly SBTech, has obtained licenses (and approval, as applicable) in six states in the United States and in the United Kingdom, Gibraltar, Malta and Romania. Additionally, our B2B business has certified its software in various territories, including in Denmark, Italy, Nigeria, Portugal, South Africa and Spain, and its services are available in Azerbaijan, Belgium, Cyprus, Czech Republic, Greece, Mexico, Poland and Spain under local licenses held by operators using SBTech's platform in these jurisdictions.

> Underpinning our regulatory access is our DraftKings platform that allows us to efficiently and safely scale our product offerings into multiple jurisdictions. We have developed our DraftKings platform from the ground up to meet the needs of the unique regulatory environment that the United States offers, while maintaining ease of use for our users. We provide a single experience for login, verification and wallet.

57

> Our SBTech platform has been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on user behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

192.    The October 8, 2020 Prospectus also included the following statement describing the heavy reliance of SBTech on a single unnamed reseller:

> SBT historically offered its services directly to operators in Europe and uses a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. In particular, SBT relied primarily on one reseller for its Asia revenue. This reseller accounted for approximately 46% of SBT's revenue in the year ended December 31, 2019. An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

193.    The statements referenced in ¶189–92 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the Company was not acting responsibly and was instead continuing to engage in the Illicit Operations.

### November 13, 2020 Press Release and Earnings Call

194.    On November 13, 2020 the Company announced financial results for the third quarter of 2020. In a press release issued in conjunction with the announcement, the Company stated:

> DraftKings Inc. . . . today reported its financial results for the third quarter of 2020. For the three months ended September 30, 2020, DraftKings reported revenue of $133 million, an increase of 98% compared to $67 million during the same period in 2019. After giving pro forma effect to the business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp., as if it had occurred on January 1, 2019, revenue grew 42% compared to the three months ended September 30, 2019.

> "The resumption of major sports such as the NBA, MLB and the NHL in the third quarter, as well as the start of the NFL season, generated tremendous customer engagement," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In addition to our year-over-year pro forma revenue growth of 42%, DraftKings recorded an increase in monthly unique payers of 64% to over 1 million, demonstrating the effectiveness of our data-driven sales and marketing approach. Our product offerings and scalable platform provide a distinctive and personalized

experience for customers across the ten states where we operate mobile sports betting today, and we look forward to entering additional jurisdictions at the earliest opportunity."

195.    The Company also held a conference call that day to discuss the Company's quarterly financial results. In the call, Defendant Robins stated as follows:

> DraftKings had a very productive third quarter on a number of different fronts. First, our Q3 performance confirms what we foreshadowed on our previous earnings call. The return of major sports has generated tremendous customer engagement. Third quarter revenue of $133 million was at the high end of the range we outlined in our recent S-1 and grew 42% year-over-year. In Q3, we also had more than 1 million monthly unique payers, which means the average for the month of July, August and September was greater than 1 million.

196.    Defendant Robins further stated that "[w]e continue to be very excited with the product and technology investments we are making, as well as with our progress on the technology migration of business integration of SBTech." Furthermore, he stated: "As a reminder, with the acquisition of SBTech, we now have almost 1,100 engineers worldwide dedicated to creating best-in-class technology and games and experiences for our users."

197.    The statements referenced in ¶194–96 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the continued integration with SBTech further exposed the Company to SBTech's long and ongoing history of engaging in the Illicit Operations.

### February 26, 2021 Form 10-K, Press Release, and Earnings Call

198.    On February 26, 2021, the Company filed its annual report for the 2020 Fiscal Year (the "2020 10-K"). The 2020 10-K was personally signed by defendants Robins, Park, Sloan, Isaacs, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Rosenblatt, Salter, and Walden, and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Robins and Park attesting to the accuracy of the information regarding the Company's financial condition and operations.

199.    The 2020 10-K included the following statement describing the heavy reliance of SBTech on a single unnamed reseller:

SBT historically offered its services directly to operators in Europe and through a reseller model in Asia. SBT's historical financial performance depended on the underlying financial performance of its direct operators and its resellers. ***For example, SBT relied primarily on one reseller for approximately 52% of SBT's revenue in the year ended December 31, 2020*** (excludes SBT activity that occurred prior to the Business Combination on April 23, 2020). An adverse decline in the underlying financial performance of key SBT operators or resellers, or a termination of some or all of the agreements with such resellers or operators, could have a material adverse effect on our business.

(Emphasis added.)

200.    The 2020 10-K also included the following statement describing the Company's international business-to-business marketing strategy:

**B2B Business Marketing** - Our core B2B marketing strategy is centered around attending and exhibiting at major trade shows around the world. SBTech's trade show marketing is supplemented with digital and offline marketing campaigns in leading industry publications, websites, regular media pieces and participation on industry panels. SBTech's reputation and customer testimonials also assist in its marketing and business efforts.

201.    The 2020 10-K stated the following regarding the Company's compliance efforts:

We have developed and implemented an internal compliance program to help ensure that we comply with legal and regulatory requirements imposed on us in connection with our DFS, Sportsbook and iGaming activities. Our compliance program focuses on, among other things, reducing and managing problematic gaming and providing tools to assist users in making educated choices related to gaming activities.

SBTech offerings have been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on player behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers full control of their gaming to allow them to play responsibly.

(Emphasis added.)

202.    The Company also issued a press release in conjunction with the announcement of its financial results for the fourth quarter of 2020 and the full year 2020. The press release stated:

For the three months ended December 31, 2020, DraftKings reported revenue of $322 million, an increase of 146% compared to $131 million during the same period in 2019. ***After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 98% compared to the three months ended December 31, 2019.***

"With a favorable fourth quarter sports calendar and strong marketing execution, DraftKings was able to generate tremendous customer acquisition and engagement that propelled us to $322 million in fourth quarter revenue, a 98% year over year increase," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "In the fourth quarter of 2020, we saw MUPs increase 44% to 1.5 million and ARPMUP increase 55% to $65. We are raising our revenue outlook for 2021 due to our expectation for continued growth, the outperformance of our core business and newly launched states that were not included in our previous guidance."

(Emphasis added.)

203.    The Company also held a conference call that day to discuss the Company's financial results for the fourth quarter of 2020 and full year 2020. During the call, Defendant Robins made the following statement regarding the integration of SBTech and Old DK as a result of the Merger:

Our list of accomplishments in 2020 is impressive. We completed the business combination with SBTech and became a publicly traded company in April. We are well on our way to completing the integration of the two companies from a team organization and business standpoint and are progressing with the migration to our own in-house sports betting engine, which we expect will be complete by the end of the third quarter in 2021.

204.    Defendant Robins also made the following statement regarding the Company's earnings:

We exceeded our expectations for 2020. Pro forma revenue grew nearly 50% to $644 million versus $432 million last year. Both MUPs and ARPMUP grew 29% in 2020. We had a strong close to the year with Q4 revenue growing almost 100% year over year and MUPs and ARPMUPS growing 44% and 55%, respectively, in the quarter. Revenue for the year was almost $95 million higher than the midpoint of our guidance. These results were due to over-performance in our core business as well as multiple assumptions on external factors that broke our way, such as the sports calendar, the extension of mobile registration in Illinois and better-than-expected whole percentage in online Sportsbook.

205.    The statements referenced in ¶¶199–204 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that SBTech's revenue came in significant part from a "front" entity and other resellers operating in black and grey markets.

### March 19, 2021 Proxy Statement

206.    On March 19, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Robins, Isaacs, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley,

Murray, Nada, Rosenblatt, Salter, Sloan, and Walden solicited the 2021 Proxy Statement filed

pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and

omissions.[19]

207.     The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect

Defendants Robins, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray,

Nada, Salter, Sloan, and Walden to the Board; (2) ratify the appointment of BDO USA, LLP as

the Company's independent registered public accounting firm for the fiscal year ending December

31, 2021; and (3) hold an advisory vote on the frequency of executive compensation votes.

208.     The 2021 Proxy Statement stated the following regarding the risk oversight

functions of the Board and its committees:

> The Board has ultimate responsibility for oversight of the Company's risk
> management processes. The Board discharges this oversight responsibility through
> regular reports received from and discussions with senior management on areas of
> material risk exposure to the Company. These reports and Board discussions
> include, among other things, operational, financial, legal and regulatory, and
> strategic risks. Additionally, the Company's risk management processes are
> intended to identify, manage, and control risks so that they are appropriate
> considering the Company's scope, operations, and business objectives. The full
> Board (or the appropriate committee in the case of risks in areas for which
> responsibility has been delegated to a particular committee) engages with the
> appropriate members of senior management to enable its members to understand
> and provide input to, and oversight of, our risk identification, risk management, and
> risk mitigation strategies. The audit committee also meets regularly in executive
> session without management present to, among other things, discuss the
> Company's risk management culture and processes. For example, as part of its
> charter, our audit committee is responsible for, among other things, discussing the
> Company's policies with respect to risk assessment and risk management, and
> reviewing contingent liabilities and risks that may be material to the Company. In
> addition, the compliance committee monitors risks relating to certain compliance
> matters, such as those described in the section "Compliance Committee," and
> recommends appropriate actions in response to those risks. When a committee
> receives a report from a member of management regarding areas of risk, the chair

---

[19] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are
based solely on negligence; they are not based on any allegation of reckless or knowing conduct
by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.
Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to
any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

of the relevant committee is expected to report on the discussion to the full Board to the extent necessary or appropriate. This enables the Board to coordinate risk oversight, particularly with respect to interrelated or cumulative risks that may involve multiple areas for which more than one committee has responsibility. The Board or applicable committee also has authority to engage external advisors to the extent necessary or appropriate.

209.    The 2021 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants R. Moore, Mosley, Murray (Chair) and Nada:

The audit committee oversees our corporate accounting and financial reporting process. Among other matters, the audit committee:
- appoints our independent registered public accounting firm;
- evaluates the independent registered public accounting firm's qualifications, independence and performance;
- determines the engagement of the independent registered public accounting firm;
- reviews and approves the scope of the annual audit and the audit fee;
- discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly financial statements;
- approves the retention of the independent registered public accounting firm to perform any proposed permissible non-audit services;
- monitors the rotation of partners of the independent registered public accounting firm on our engagement team in accordance with requirements established by the SEC;
- is responsible for reviewing our financial statements and our management's discussion and analysis of financial condition and results of operations to be included in our annual and quarterly reports to be filed with the SEC;
- reviews our critical accounting policies and estimates; and
- reviews the audit committee charter and the committee's performance at least annually.

210.    Similarly, the 2021 Proxy Statement listed certain responsibilities of the Compliance Committee, which at that time consisted of Defendants Isaacs, Liberman, Salter, and Walden:

The compliance committee oversees our non-financial compliance matters. Among other matters, the compliance committee:
- identifies, reviews and analyzes laws and regulations applicable to us;
- recommends to the Board, and monitors the implementation of, compliance programs, policies and procedures that comply with local, state and federal laws, regulations and guidelines;
- reviews significant compliance risk areas identified by management;
- discusses periodically with management the adequacy and effectiveness of policies and procedures to assess, monitor, and manage non-financial compliance business risk and compliance programs;

- monitors compliance with, authorize waivers of, investigate alleged breaches of and enforce our non-financial compliance programs; and
- reviews our procedures for the receipt, retention and treatment of complaints received regarding non-financial compliance matters.

211. The 2021 Proxy Statement was materially misleading because it failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's, Audit Committee's, and Compliance Committee's risk oversight functions, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

212. The 2021 Proxy Statement also failed to disclose that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets even after the Merger; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company; (4) as a result of the foregoing, the Company had misstated its financial prospects, which were reliant in part upon SBTech's having engaged in the Illicit Operations; and (5) the Company failed to maintain adequate internal controls.

213. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders reelected Defendants Robins, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter, Sloan, and Walden, allowing them to continue breaching their fiduciary duties to DraftKings.

### May 7, 2021 Press Release and Earnings Call

214. On May 7, 2021 the Company announced financial results for the first quarter of 2021. Among other statements, the Company revised its 2021 revenue guidance upward. In a press release issued in conjunction with the announcement, the Company stated as follows:

> For the three months ended March 31, 2021, DraftKings reported revenue of $312 million, an increase of 253% compared to $89 million during the same period in 2020. After giving pro forma effect to the business combination with SBTech (Global) Limited ("SBTech") and Diamond Eagle Acquisition Corp. which was completed on April 23, 2020, as if it had occurred on January 1, 2019, revenue grew 175% compared to the three months ended March 31, 2020.

"DraftKings is off to an outstanding start in 2021," said Jason Robins, DraftKings' co-founder, CEO and Chairman of the Board. "We continued to make progress and remain on track with the migration to our own in-house proprietary sports betting engine, strengthened our content and technology capabilities with the acquisitions of VSiN and BlueRibbon Software, and invested in further differentiating our product offering with the upcoming rollout of social functionality in our DFS and mobile Sportsbook apps."

Jason Park, DraftKings' Chief Financial Officer, added, "Our $312 million in first quarter revenue, 114% increase in MUPs and 48% growth in ARPMUP reflect solid customer acquisition and retention as well as successful launches of mobile sports betting and iGaming in new states. We are raising our revenue outlook for 2021 due to the outperformance of our core business in the first quarter and our expectation for continued healthy growth."

215.    The Company also held a conference call that day to discuss the Company's financial results for the first quarter of 2021. During the call, Defendant Robins made the following statement regarding the Company's financial progress:

DraftKings is off to an outstanding start in 2021. Revenue for the first quarter increased 175% year over year to $312 million on a pro forma basis. MUPs grew 114% and ARPMUP grew 48%. These results reflect continued overperformance of our core business due to strong customer acquisition and retention, as well as the successful launches of mobile sports betting and iGaming in Michigan and mobile sports betting in Virginia.

216.    The statements referenced in ¶214–15 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that the Company's revenues were reliant upon SBTech's ongoing engagement in the Illicit Operations.

217.    Defendants' statements referenced above were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets even after the Merger; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company; (4) as a result of the foregoing, the Company had misstated its financial prospects, which were reliant

in part upon SBTech's having engaged in the Illicit Operations; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, DraftKings's public statements touting the Company's partnerships, preorders, and effective internal controls were materially false and misleading at all relevant times.

**The Truth Emerges**

218.   On June 15, 2021, Hindenburg published the Report, entitled "DraftKings: A $21 Billion SPAC Betting It Can Hide Its Black Market Operations." The Report revealed the Illicit Operations, noting that "SBTech has a long and ongoing record of operating in black markets."

219.   In summarizing its major findings, the Report stated that SBTech accounted for approximately 25% of total revenue at the time of the Merger and "was the only positive contributor to operating income." The Report stated that the Merger exposed the Company to SBTech's "extensive dealings in black-market gaming, money laundering and organized crime." The Report further alleged that "SBTech has a ***long and ongoing record of operating in black markets***. (Emphasis added.) In particular, it claimed that "roughly 50% of SBTech's revenue continues to come from continues to come from markets where gambling is banned." The Report revealed that Hindenburg Research had "identified numerous black market clients of DraftKings' 'front' entity, through searches on social media and back-end web infrastructure." In sum, the Report contended that "DraftKings has systematically skirted the law and taken elaborate steps to obfuscate its black market operations. ***These violations appear to be continuing to this day***, all while insiders aggressively cash out amidst the market froth." (Emphasis added.)

220.   The Report explained that SBTech's foray into Asian markets began in 2014, when "competition pushed SBTech to seek business in markets where others were unwilling to operate." The Report contained screenshots showing that SBTech accepted Vietnamese Dong and Indonesian Rupees, currencies from "black market sports gambling jurisdictions."

221.   According to "multiple former employees" interviewed by Hindenburg, the SBTech and BTi/CoreTech undertook renaming and rebranding efforts designed to "separate the entity's 'behind the scenes' black market operations to pave the way for a U.S. deal partner like DraftKings[], with its polished and clean exterior." These included the renaming of BTi to

1 CoreTech.

2      222.    The Report explained that Defendant Meckenzie, as "SBTech owner," "sp[u]n out

3 certain of his gambling operations to at least separate entities. The entities were placed under the

4 control of relatives or trusted confidantes and run by many of the same staff." In particular, the

5 Report revealed the significant role that "Tom Light, the SVP of business development," had in

6 departing SBTech to found BTi/CoreTech. The Report linked Light to Defendant Meckenzie via

7 an interview with a former SBTech employee, who described Light as Defendant Meckenzie's

8 "right-hand man." The Report further linked SBTech and BTi/CoreTech by showing that

9 BTi/CoreTech "was set up across town from SBTech's office in Sofia, Bulgaria, 4.5 miles (7.2

10 km) away, per Bulgarian corporate records."

11      223.    The Report also tied SBTech and BTi/CoreTech to black market operators and

12 suspected organized crime. It listed numerous examples that corroborated the Report's central

13 claims. The Report stated: (1) "BTi's Sportsbook Is Advertised Through a Site Linked To A Recent

14 Raid on An Alleged illegal Operator in Thailand"; (2) "12Bet, A Site Tied To Triads and At The

15 Center Of A Swiss Money Laundering Investigation, Advertises Its Use of Bti's Technology"; (3)

16 "Gaming Site Fun88, Linked to An Illegal Gaming Raid in Vietnam, Also Advertises Its Use of

17 Bti's Platform"; (4) "SBTech Claimed to Oregon Regulators That Its Customer 10Bet Did Not

18 Derive Revenue From China (A Major Black Market) Using SBTech's Software"—"We Found

19 Multiple Chinese-Facing 10Bet Sites Where Backend Web Infrastructure Demonstrates SBTech's

20 Involvement"; (5) "10bet, A Sports Betting Firm With Apparent Ongoing Operations in China,

21 Was Launched By SBTech Founder Shalom Meckenzie"—"In Mid-2018 Meckenzie Stepped

22 Down from 10Bet and Transferred His Shares to His Brother To (Once Again) Obfuscate The

23 Connection"—"DraftKings Continues to Do Business With the Entity, Per Its SEC Filings"; and

24 (6) "SBTech Operated in Iran For Years, According to Multiple Former Employees, Contrary to

25 Its Representations to Oregon State Regulators."

26      224.    Finally, the Report made clear that SBTech's engagement in the Illicit Operations

27 is ongoing. It stated that, "[d]espite the small legal market in Asia, DraftKings states in its SEC

28 filings that **an unnamed customer** focused on Asian markets accounted for 46% of SBTech's

2019 revenue and 52% of SBTech's 2020 revenue, but failed to disclose the name of the customer." A former employee interviewed by Hindenburg stated that "if it's Asia it will have to be (BTi) . . . it must be through BTi."

225.    In its conclusion, the Report elaborated on the repercussions of its findings regarding the Illicit Operations:

> One issue with partnering with black market betting operators is that such businesses are not *just* engaged in illegal betting. These operators almost by definition are engaged in money laundering, and often additional lines of underground business activity.

> As one former employee told us succinctly, SBTech founder Meckenzie and his affiliate entities have "sold to plenty of mobs".

> The same former employee explained that DraftKings and its SPAC sponsors must have either known the issues with SBTech's black market operations or were grossly negligent in their diligence:

> "I would be really, really, really surprised if they didn't know. In fact, it would be really, really amateur of them if they didn't investigate that. Presumably they knew and . . . helped facilitate hiding it or turned a blind eye to it . . . but they must have known."

> ***DraftKings has never identified the nature of its BTi/CoreTech relationship in any of its SEC filings - not as an affiliate or subsidiary of SBTech or in any other way as relevant to DraftKings' SPAC combination with SBTech. It also has not provided transparency regarding the markets SBTech and its other "resellers" and affiliates operate in, and their respective contributions to the public company.***
> Given the importance of SBTech to DraftKings' top and bottom-line, it is virtually impossible to fathom that DraftKings was and continues to remain unaware of its ongoing relationship with BTi/CoreTech and its illicit operators.

> Yet rather than disclose anything about these relationships, the company instead appears to have created a complex web of misinformation to conceal them.

(Emphasis altered from original.)

226.    On this news, the Company's share price fell $2.11, or 4.17% from its close price of $50.62 on June 14, 2021 to close at $48.51 per share on June 15, 2021.

227.    When the Company filed its next quarterly report on Form 10-Q, it disclosed that "[o]n July 9, 2021, the Company received a subpoena from the SEC seeking documents concerning certain of the allegations raised in the Hindenburg Report."

## DAMAGES TO DRAFTKINGS

228.    As a direct and proximate result of the Individual Defendants' misconduct, DraftKings has lost and will continue to lose and expend many millions of dollars.

229.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Actions filed against the Company, its CEO and CFO, and DEAC's former CEO and CFO; defending against the SEC subpoena and any internal investigations; and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

230.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

231.    As a direct and proximate result of the Individual Defendants' conduct, DraftKings has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

232.    Plaintiff brings this action derivatively and for the benefit of DraftKings to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of DraftKings, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

233.    DraftKings is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

234.    Plaintiff is, and has been at all relevant times, a shareholder of DraftKings. Plaintiff will adequately and fairly represent the interests of DraftKings in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

235.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

236.    A pre-suit demand on the Board of DraftKings is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Robins, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter, Sloan, and Walden (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to seven of thirteen Director-Defendants who are on the Board at the time this action is commenced.

237.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while seven of them conducted insider sales for proceeds of approximately $825.3 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

238.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme to cause or permit the Company to engage in the Illicit Operations and to issue false and misleading statements to the public. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

239.    Additional reasons that demand on Defendant Robins is futile follow. Defendant Robins cofounded Old DK in 2011 and served as its CEO until the Merger, when he became CEO and Chairman of the Board of the Company. Thus, as the Company admits, he is a non-independent director. Defendant Robins controlled 91.2% of the Company's total voting power at the time the

2021 Proxy Statement was field with the SEC, making him a controlling shareholder. Moreover, the Company provides Defendant Robins with his principal occupation for which he receives handsome compensation, including over $236.8 million in compensation for the 2020 Fiscal Year alone. As CEO, Defendant Robins was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As the Company's highest officer and as Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Robins is a defendant in the Securities Class Actions. For these reasons, Defendant Robins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

240.    Additional reasons that demand on Defendant Kalish is futile follow. Defendant Kalish cofounded Old DK in 2011 and served as its Chief Revenue Officer from 2014 to 2019, after which he was appointed President, DraftKings North America. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Kalish with his principal occupation for which he receives handsome compensation, including over $197,235,333 in compensation for the 2020 Fiscal Year alone. Before the truth emerged regarding the Illicit Operations, Defendant Kalish sold $3,110,175.72 of Company stock at artificially inflated prices based on inside information. The 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kalish breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him

is futile and, therefore, excused.

241.    Additional reasons that demand on Defendant Levin is futile follow. Defendant Levin served as a director of Old DK from December 2013 until the Merger and thus contributed to the consummation of the Merger, which exposed the Company to the Illicit Operations.  He is currently a member of the Nominating and Corporate Governance Committee. Defendant Levin received and continues to receive substantial compensation for his service on the Board, including $375,893 in the 2020 Fiscal Year. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Levin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

242.    Additional reasons that demand on Defendant Liberman is futile follow. Defendant Liberman cofounded Old DK in 2011 and served as its Chief Operations Officer from 2015 until December 2019, when he was appointed President, Global Technology and Product. Thus, as the Company admits, he is a non-independent director. However, despite his lack of independence, Defendant Liberman currently sits on the Compliance Committee. The Company provides Defendant Liberman with his principal occupation for which he receives handsome compensation, including $197,220,479 in compensation for the 2020 Fiscal Year alone. Before the truth emerged regarding the Illicit Operations, Defendant Liberman sold $4,574,700 of Company stock at artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant

1    Liberman breached his fiduciary duties, faces a substantial likelihood of liability, is not

2    independent or disinterested, and thus demand upon him is futile and, therefore, excused.

3         243.    Additional reasons that demand on Defendant Meckenzie is futile follow.

4    Defendant Meckenzie is the founder of SBTech and served as its director until May 2014. He also

5    served as a member of the board of directors of a subsidiary of SBTech from 2003 until 2018.

6    Thus, as the Company admits, he is a non-independent director. Defendant Meckenzie currently

7    serves as a member of the Compensation Committee, and he received and continues to receive

8    substantial compensation for his service on the Board, including $373,618 in the 2020 Fiscal Year.

9    SBTech's engagement in the Illicit Operations and its involvement with BTi/CoreTech form the

10   core of the allegations in this complaint, and therefore Defendant Meckenzie, due to his

11   longstanding history with SBTech, cannot dispassionately investigate the allegations made herein.

12   In addition, Companies owned by Defendant Meckenzie or his brother have repeatedly engaged

13   in related-party transactions with SBTech, making it exceedingly unlikely that Defendant

14   Meckenzie would launch any investigation into the Illicit Operations with the potential to expose

15   how Defendant Meckenzie has profited at SBTech's expense. Moreover, before the truth emerged

16   regarding the Illicit Operations, Defendant Meckenzie sold $387,403,543.04 of Company stock at

17   artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was

18   solicited on his behalf, and the false and misleading statements contained therein contributed to

19   his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of

20   the scheme to cause the Company to make false and misleading statements, consciously

21   disregarded his duties to monitor internal controls over reporting and engagement in the scheme,

22   and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant

23   Meckenzie breached his fiduciary duties, faces a substantial likelihood of liability, is not

24   independent or disinterested, and thus demand upon him is futile and, therefore, excused.

25        244.    Additional reasons that demand on Defendant J. Moore is futile follow. Defendant

26   J. Moore currently serves as a member of the Nominating and Corporate Governance Committee,

27   the Compliance Committee, and the Compensation Committee. She received and continues to

28   receive substantial compensation for her service on the Board, including $199,979 in the 2020

Fiscal Year. The 2021 Proxy Statement was solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director with significant responsibilities on Board committees, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant J. Moore breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

245. Additional reasons that demand on Defendant R. Moore is futile follow. Defendant R. Moore currently serves as a member of the Audit Committee and the Compensation Committee. He received and continues to receive substantial compensation for his service on the Board, including $376,790 in the 2020 Fiscal Year. Before the truth emerged regarding the Illicit Operations, Defendant R. Moore sold $50,830,000 of Company stock at artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant R. Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246. Additional reasons that demand on Defendant Mosley is futile follow. Defendant Mosley currently serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. She received and continues to receive substantial compensation for her service on the Board, including $199,979 in the 2020 Fiscal Year. The 2021 Proxy Statement was solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Mosley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Murray is futile follow. Defendant Murray currently serves as a member of the Audit Committee. He received and continues to receive substantial compensation for his service on the Board, including $378,136 in the 2020 Fiscal Year. Before the truth emerged regarding the Illicit Operations, Defendant Murray sold $78,579,316.92 of Company stock at artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant Nada is futile follow. Defendant Nada currently serves as a member of the Audit Committee and the Compensation Committee. He received and continues to receive substantial compensation for his service on the Board, including $394,656 in the 2020 Fiscal Year. Before the truth emerged regarding the Illicit Operations, Defendant Nada sold $48,121,370.96 of Company stock at artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Nada breached his fiduciary duties, faces a

75

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

249.     Additional reasons that demand on Defendant Salter is futile follow. Defendant Salter currently serves as a member of the Compliance Committee. He received and continues to receive substantial compensation for his service on the Board, including $389,836 in the 2020 Fiscal Year. Before the truth emerged regarding the Illicit Operations, Defendant Salter sold $252,755,834.76 of Company stock at artificially inflated prices based on inside information. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Salter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.     Additional reasons that demand on Defendant Sloan is futile follow. Defendant Sloan was a founding investor of DEAC and currently serves as Vice Chairman of the Company's Board, in addition to being a member of the Board's Nominating and Corporate Governance Committee. He received and continues to receive substantial compensation for his service on the Board, including $375,445 in the 2020 Fiscal Year. Defendant Sloan has cofounded seven SPACs with his partners, raising aggregate gross proceeds of over $4 billion. He was a leading orchestrator of the Merger and is thus exceedingly unlikely to initiate an investigation into the propriety of the Merger or any of the misconduct alleged herein. Moreover, any revelation that the Merger was tainted by misconduct would negatively affect Defendant Sloan's ability to execute *future* SPAC deals, disrupting a business strategy that has proved to be enormously profitable to him personally. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director and a leader of the Board, he conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sloan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.    Additional reasons that demand on Defendant Walden is futile follow. Defendant Walden currently serves as a member of the Compliance Committee and the Nominating and Corporate Governance Committee. She received and continues to receive substantial compensation for her service on the Board, including $375,445 in the 2020 Fiscal Year. The 2021 Proxy Statement was solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Walden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

252.    Additional reasons that demand on the Board is futile follow.

253.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Director-Defendants Robins, Kalish, and Liberman cofounded Old DK in December 2011. Additionally, Director-Defendants Robins, Kalish, Liberman, Meckenzie, Salter, Sloan all worked together—along with Defendants Sagansky, Baker, and Park—to consummate the Merger. In particular, Director-Defendants Meckenzie, Robins, and Sloan first met on June 15, 2019 as respective leaders of SBTech, Old DK, and DEAC to initiate the plan that led to the April 2020 Merger. Director-Defendant Sloan has cofounded seven SPACs with his business partners, which include Defendants Sagansky and Baker, raising aggregate gross proceeds of over $4 billion. Due to

Director-Defendant Sloan's substantial history of highly profitable deals with Defendants Sagansky and Baker, Defendant Sloan is unlikely to initiate suit against Defendant Sagansky and Defendant Baker. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

254.   Defendants R. Moore, Mosley, Murray, and Nada (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing and reviewing the Company's accounting and financial services, internal operating controls, and ethical standards, as well as ensuring the independence of auditors, the integrity of management, and the adequacy of disclosures to shareholders. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

255.   Defendants Isaacs, Liberman, Salter, and Walden (the "Compliance Committee Defendants") served as members of the Compliance Committee during the Relevant Period. Pursuant to the Company's Compliance Committee Charter, the Compliance Committee Defendants are responsible for, *inter alia*, reviewing and analyzing nonfinancial laws and regulations applicable to the Company and taking steps to ensure the Company remains in compliance with such laws and regulations. The Compliance Committee Defendants failed to adequately oversee the Company's reporting processes, failed to identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Compliance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

256.   Demand in this case is further excused because the Director-Defendants are beholden to and controlled by Defendant Robins, who is cofounder, CEO, Chairman, and a

controlling shareholder with beneficial ownership of over 91.2% of the Company's voting power as of March 1, 2021. In light of this of this, the Director-Defendants cannot impartially consider a demand against Defendant Robins, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendants Kalish and Liberman, who are also executives at DraftKings. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of Defendant Robins' control over them.

257.    In violation of the Code and the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

258.    DraftKings has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for DraftKings any part of the damages DraftKings suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

259.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all, or at least a majority, of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be

presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.   The acts complained of herein constitute violations of fiduciary duties owed by DraftKings's officers and directors, and these acts are incapable of ratification.

261.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of DraftKings. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of DraftKings, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

262.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause DraftKings to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Defendants Sagansky, Delman, Kazam, Rosen, Ross, Robins, Isaacs, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Rosenblatt, Salter, Sloan, and Walden for Violations of Section 14(a) of the Exchange Act**

264.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

266.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

267.    Under the direction and watch of the Defendants Sagansky, Delman, Kazam, Rosen, and Ross (the "2020 Proxy Statement Defendants"), the 2020 Proxy Statement acknowledged SBTech's significant international operations but failed to disclose that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company following the Merger; (4) DEAC's officers and directors failed to perform effectual due diligence in evaluating SBTech for purposes of the Merger, or consummated the Merger despite knowing of the Illicit Operations; and (5) DEAC failed to maintain adequate internal controls. As a result, the 2020 Proxy Statement was materially false and misleading.

268.   In the exercise of reasonable care, the 2020 Proxy Statement Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, the Merger, which exposed the Company and its subsidiaries to SBTech's long and ongoing record of engaging in the Illicit Operations.

269.   The false and misleading elements of the 2020 Proxy Statement led to, among other things, the consummation of the Merger.

270.   Under the direction and watch of the Defendants Robins, Isaacs, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Rosenblatt, Salter, Sloan, and Walden (the "2021 Proxy Statement Defendants"), the 2021 Proxy Statement failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's, Audit Committee's, and Compliance Committee's risk oversight functions, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties. The 2021 Proxy Statement further failed to disclose that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets even after the Merger; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company; (4) as a result of the foregoing, the Company had misstated its financial prospects, which were reliant in part upon SBTech's having engaged in the Illicit Operations; and (5) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

271.   In the exercise of reasonable care, the 2021 Proxy Statement Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The

misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of Defendants Robins, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter, Sloan, and Walden.

272.   The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Defendants Robins, Kalish, Levin, Liberman, Meckenzie, J. Moore, R. Moore, Mosley, Murray, Nada, Salter, Sloan, and Walden, which allowed them to continue to breach their fiduciary duties to DraftKings. The false and misleading elements of the 2021 Proxy Statement also led the Company's shareholders to consider other matters, including the ratification of the appointment of BDO USA, LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021, which was approved, and the frequency of executive compensation votes.

273.   The Company was damaged as a result of the material misrepresentations and omissions in the 2020 Proxy Statement and the 2021 Proxy Statement.

274.   Plaintiff, on behalf of DraftKings, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

275.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DraftKings's business and affairs.

277.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DraftKings.

279.   In breach of their fiduciary duties owed to DraftKings, and throughout the Relevant

Period, the Individual Defendants engaged in or caused the Company to engage in the Illicit Operations, which increased the risk of regulatory or criminal action against the Company.

280.    In further breach of their fiduciary duties owed to DraftKings, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) SBTech has a long and ongoing record of engaging in the Illicit Operations; (2) SBTech's attempts to distance itself from the Illicit Operations were illusory, as SBTech continued to transact with a "front" entity and other resellers operating in black and grey markets even after the Merger; (3) SBTech's misconduct increased the risk of regulatory or criminal action against the Company; (4) as a result of the foregoing, the Company had misstated its financial prospects, which were reliant in part upon SBTech's having engaged in the Illicit Operations; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, DraftKings's public statements were materially false and misleading at all relevant times.

281.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while seven of them conducted insider sales of Company common stock for proceeds of approximately $825.3 million, which renders them personally liable to the Company for breaching their fiduciary duties.

282.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

283.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DraftKings's securities. The Individual Defendants, in good faith, should have taken appropriate action to

correct the scheme alleged herein and to prevent it from continuing to occur.

284.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

285.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DraftKings has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

286.     Plaintiff on behalf of DraftKings has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

287.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

288.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DraftKings.

289.     The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from DraftKings that was tied to the performance or artificially inflated valuation of DraftKings, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

290.     Plaintiff, as a shareholder and a representative of DraftKings, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

291.     Plaintiff on behalf of DraftKings has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

292.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

293.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DraftKings, for which they are legally responsible.

294.    As a direct and proximate result of the Individual Defendants' abuse of control, DraftKings has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

295.    Plaintiff on behalf of DraftKings has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

296.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DraftKings in a manner consistent with the operations of a publicly-held corporation.

298.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DraftKings has sustained and will continue to sustain significant damages.

299.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

300.    Plaintiff on behalf of DraftKings has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

301.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

302.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

303.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused DraftKings to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

304.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

305.    Plaintiff on behalf of DraftKings has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Robins, Park, Sagansky, and Baker for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

306.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

307.    DraftKings and the Securities Class Action Defendants are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as controlling shareholder, officers and/or director of the Company.

308.    Defendants Robins and Park, because of their positions of control and authority as CEO and CFO of DraftKings, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DraftKings, including the wrongful acts complained of herein and in the Securities Class Actions.

309.    Defendants Sagansky and Baker, because of their positions of control and authority as CEO and CFO of DEAC, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DEAC, including the wrongful acts complained of herein and in the Securities Class Actions.

310.    Accordingly, the Securities Class Action Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

311. As such, DraftKings is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of DraftKings, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DraftKings;

(c)     Determining and awarding to DraftKings the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing DraftKings and the Individual Defendants to take all necessary actions to reform and improve DraftKings's corporate governance and internal procedures to comply with applicable laws and to protect DraftKings and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of DraftKings to nominate at least seven candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding DraftKings restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED this 6th day of January, 2022

LEVERTY & ASSOCIATES LAW CHTD.

Patrick R. Leverty, Esq., NV Bar No. 8840
William R. Ginn, Esq., NV Bar No. 6989
LEVERTY & ASSOCIATES LAW, CHTD.
832 Willow Street
Reno, NV 89502
Phone (775)322-6636
*Attorneys for Plaintiffs*